FIRST NATIONAL STATE BANK OF NEW JERSEY (FORMERLY NATIONAL STATE BANK OF NEWARK, N.J.), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3495–66.   Filed December 18, 1968.

---

*Myles J. Sachs*, for the petitioner.

*Leo A. Burgoyne* and *Barry N. Mosebach*, for the respondent.

### OPINION

SCOTT, *Judge:* Respondent determined deficiencies in petitioner's income tax for the calendar years 1958 and 1959 in the amounts of $96,180.29 and $46,967.49, respectively.

The issue for decision is the proper basis to petitioner under the provisions of section 334(b)(2), I.R.C. 1954,[1] of assets received by it upon liquidation of a subsidiary.

All of the facts have been stipulated and are found accordingly.

Petitioner, formerly National State Bank of Newark, N.J., is a national bank duly organized and existing under the laws of the United States. Its principal office at the date of the filing of the petition herein was in Newark, N.J. Petitioner filed its Federal corporate income tax returns for the calendar years 1958 and 1959 under its former name with the district director of internal revenue, Newark, N.J.

Federal Trust Co. (hereinafter referred to as Federal) was a banking association organized under the laws of New Jersey with its principal office up to the time of its merger into petitioner in Newark, N.J. On September 4, 1958, petitioner and Federal executed an agreement to merge which was to become effective at a time specified in a certificate to be issued by the Comptroller of the Currency of the U. S. Treasury Department. The agreement recited that Federal had and should contribute to petitioner acceptable assets having a book value over and above its liabilities to its creditors of at least $5,905,964, and having an estimated fair market value over and above its liabilities to its creditors of at least $7,428,472 and provided that the shareholders of Federal, in exchange for the excess acceptable assets contributed by their bank to petitioner, should be entitled to receive

---

[1] All references are to the Internal Revenue Code of 1954.

from petitioner $51 for each share of their Federal stock upon the surrender of such share. The proposed merger, as set forth in the agreement to merge, was given preliminary approval by the Comptroller of the Currency of the U.S. Treasury Department upon certain specified conditions by a letter dated September 5, 1958. One of the conditions specified was that the corporate stock and other investment securities then carried on the books of Federal would be set up on the books of petitioner at their net book value with the understanding that the corporate stocks would be disposed of within a reasonable period after the effective date of the merger and that any nonconforming real estate loans acquired by petitioner by reason of the merger would be made to conform with the national banking laws within a reasonable period after the merger date or be disposed of. The letter further stated that when the Comptroller of the Currency issued his certificate approving the merger, petitioner would be so advised by telegram in which the effective date would be indicated. By telegram dated October 10, 1958, the Comptroller of the Currency of the U.S. Treasury Department notified petitioner that the certificate approving the merger effective as of the close of business October 10, 1958, had been issued that date.

On October 10, 1958, petitioner purchased all the issued and outstanding stock of Federal consisting of 162,250 shares of common stock at a price of $51 per share for a total cash consideration of $8,274,750, and immediately following such acquisition, effectuated a merger of its then subsidiary company, Federal. At the time of the merger, Federal's liabilities totaled $79,713,378.88, exclusive of a Federal income tax liability resulting from a determination of a deficiency of $519,129.50 which arose from an adjustment proposed by respondent after the final return of Federal was filed. On October 10, 1958, the books of Federal had reflected a reserve for bad debts of $998,325.96 which resulted from bad debt deductions taken in prior years for which Federal received full tax benefits. Petitioner as the successor to the assets of Federal filed a final income tax return on behalf of Federal covering the period January 1, 1958, to October 10, 1958. In this final income tax return Federal did not include as taxable income its reserve for bad debts of $998,325.96 or any portion thereof.

Respondent determined that the reserve for bad debts of $998,325.96 was required to be restored to Federal's income. Petitioner as successor to Federal was formally notified of this adjustment by a letter dated May 15, 1964, enclosing an agent's report proposing the adjustment. The letter formally notifying petitioner of the adjustment stated that petitioner had indicated its agreement with the adjustment shown in the report. Petitioner did agree to the determination as made

by respondent and paid the $519,129.50 income tax deficiency of Federal attributable to that determination.

Petitioner attached to its U.S. Corporation Income Tax Return for the calendar year 1958 a schedule entitled, "Reserve for Bad Debts." This schedule showed a balance in petitioner's reserve as of December 31, 1958, of $3,064,181.69, computed as follows:

| | | |
|---|---:|---:|
| Balance Jan. 1, 1958 | | $2,113,606.43 |
| Add: Recoveries | $24,204.48 | |
| Acquired from Federal Trust Co | 998,325.96 | |
| | | 1,022,530.44 |
| | | 3,136,136.87 |
| Less: Bad debts charged off | | 71,955.18 |
| Balance Dec. 31, 1958 | | 3,064,181.69 |

The schedule contained the following explanation:

The taxpayer has added $998,325.96 to its reserve for bad debts for the year 1958. This is the amount which appeared on the books of Federal Trust Company as of the date of merger with the taxpayer.

If it is determined that the reserve is not transferable by Federal Trust Company to National State Bank in connection with the merger, the taxpayer elects to claim a deduction of the amount added to the reserve, namely, $998,325.96 in computing its taxable net income for the year 1958.

Respondent, consistent with his determination of a deficiency against Federal because of including in Federal's income for its final taxable period its reserve for bad debts and with petitioner's election, allowed petitioner a deduction for addition to its bad debt reserve for the calendar year 1958 in the amount of $956,281.90, which amount the parties now agree is the maximum amount of addition to such reserve allowable to petitioner for that year.

Petitioner, on November 6, 1958, requested from the Internal Revenue Service information as to the Federal income tax consequences of the transaction involving Federal's merger into it. Petitioner received a letter from the office of the Commissioner of Internal Revenue, Washington, D.C., which stated:

Based solely on the information provided it is held as follows:

(1) The acquisition by National of the stock of Federal in the manner described above will constitute a purchase of such stock as that term is defined in section 334(b)(3) of the Internal Revenue Code of 1954.

(2) The statutory merger of Federal into National in accordance with the laws of New Jersey will constitute a complete liquidation of Federal within the meaning of the terms as used in section 332.

(3) In accordance with the provisions of section 332, no gain or loss will be recognized by National on the receipt of the property distributed pursuant to the complete liquidation by merger of Federal into National.

(4) The basis of the property received by National in complete liquidation by merger of Federal will be determined by the price of $51.00 a share paid to the shareholders of Federal as provided in section 334(b)(2).

Respondent does not now question the correctness of the conclusions in this letter.

Petitioner on its Federal income tax returns for 1958 and 1959 reported the sale of certain of the assets which it received from Federal in the merger and claimed depreciation with respect to certain of the assets which it received in that merger. Petitioner used as a total basis for the assets it acquired from Federal, an amount of $88,986,454.84, computed as follows:

| | |
|---|---:|
| Book value of Federal stock | $8,274,750.00 |
| Federal's unsecured liabilities | 79,713,378.88 |
| Federal's additional income tax liability | 519,129.50 |
| Bad debt reserve minus tax consequences | 479,196.46 |
| | 88,986,454.84 |

Respondent in his notice of deficiency recomputed the total basis of the assets received by petitioner upon the liquidation of Federal to be an amount of $88,507,258.38, using in this recomputation the amounts as used by petitioner for book value of Federal stock, Federal's unsecured liabilities, and Federal's additional income tax liability, but not including in the total basis of the assets the amount of $479,196.46 which petitioner included as "Bad debt reserve minus tax consequences." Respondent allocated the total basis of the assets as computed by him to the various assets either sold by petitioner in 1958 and 1959 or with respect to which petitioner claimed depreciation in these years in the same manner as petitioner had allocated the total basis of the assets as computed by it. Respondent's determination resulted in decreasing the basis to petitioner of the assets which petitioner acquired from Federal which were sold during the years 1958 and 1959 and decreasing the basis of the depreciable assets which petitioner had acquired from Federal. As a result of these adjustments respondent increased petitioner's income in the respective amounts of $184,962.10 and $90,322.11 for the years 1958 and 1959.

Section 334 deals with the basis of property received in liquidations. Section 334(b) states the rules applicable upon liquidation of a subsidiary. Section 334(b)(1) provides that a corporation which receives property upon liquidation of a subsidiary corporation takes the basis of the property it receives in the distribution which that property had in the hands of the transferor. Section 334(b)(2)[2] provides for an

[2] SEC. 334(b)(2). EXCEPTION.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), and if—

   (A) the distribution is pursuant to a plan of liquidation adopted—

      (i) on or after June 22, 1954, and

      (ii) not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction) ; and

   (B) stock of the distributing corporation possessing at least 80 percent of the total

exception to this rule where the corporation which receives the property acquired the stock of the subsidiary which is liquidated by purchase during a period of not more than 12 months, the end of which period is not more than 2 years prior to the liquidation. As has been pointed out in a number of cases, section 334(b)(2) was enacted to provide by statute the principle of law of *Kimbell-Diamond Milling Co.*, 14 T.C. 74 (1950), affd. 187 F. 2d 718 (C.A. 5, 1951) certiorari denied 324 U.S. 827. See *United States Holding Co.*, 44 T.C. 323, 331 (1965), and *Argus, Inc.*, 45 T.C. 63, 69 (1965). The holding in *Kimbell-Diamond Milling Co., supra*, was that where a corporation purchased the stock of another corporation for the purpose of liquidating that corporation and obtaining its assets, the transaction in substance constituted a purchase by the acquiring corporation of the assets of the other corporation for an amount which the acquiring corporation paid for the stock of the other corporation.

Section 334(b)(2) provides that the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made, and concludes:

For purposes of the preceding sentence, under regulations prescribed by the Secretary or his delegate, proper adjustment in the adjusted basis of any stock shall be made for any distribution made to the distributee with respect to such stock before the adoption of the plan of liquidation, for any money received, for any liabilities assumed or subject to which the property was received, and for other items.

Respondent issued his regulation stating that if section 334(b)(2) applies to a complete liquidation to which section 332 is applicable, then property received by a parent corporation in such complete liquidation shall have a basis "determined by reference to the basis of the stock of the subsidiary corporation with respect to which it is received." (Sec. 1.334–1(c), Income Tax Regs.) Respondent's regulation then provides (sec. 1.334–1(c)(4)):

---

combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classses of stock (except nonvoting stock which is limited and preferred as to dividends), was acquired by the distributee by purchase (as defined in paragraph (3)) during a 12-month period beginning with the earlier of,

    (i) the date of the first acquisition by purchase of such stock, or

    (ii) if any of such stock was acquired in an acquisition which is a purchase within the meaning of the second sentence of paragraph (3), the date on which the distributee is first considered under section 318(a) as owning stock owned by the corporation from which such acquisition was made,

then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. For purposes of the preceding sentence, under regulations prescribed by the Secretary or his delegate, proper adjustment in the adjusted basis of any stock shall be made for any distribution made to the distributee with respect to such stock before the adoption of the plan of liquidation, for any money received, for any liabilities assumed or subject to which the property was received, and for other items.

(4) For the purpose of section 334(b)(2) only, the following adjustments shall be made to the adjusted basis of the subsidiary's stock in the hands of the parent:

\* \* \* \* \* \* \*

(v) The adjusted basis of the subsidiary's stock held by the parent with respect to which the distributions in liquidation are made. \* \* \*

(a) Shall be increased—

(1) By the amount of any unsecured liabilities assumed by the parent, and

(2) By the portion of the subsidiary's earnings and profits (less the amount of any distributions therefrom) of the period beginning on the date of purchase and ending upon the date of the last distribution in liquidation attributable to the stock of the subsidiary held by the parent.

(b) Shall be decreased:

(1) By the amount of any cash and its equivalent, and

(2) By the portion of the subsidiary's deficit in earnings and profits of the period beginning on the date of purchase and ending upon the date of the last distribution in liquidation attributable to the stock of the subsidiary held by the parent.

\* \* \* \* \* \* \*

(vi) (d) In the case of a subsidiary using the cash receipts and disbursements method of accounting, the earnings and profits of such subsidiary shall be computed for the period specified in subdivision (v) (a) (2) and (b) (2) of this subparagraph as if such subsidiary had used an accrual method of accounting prior to such period.

It is petitioner's position that Federal's earnings and profits were increased in "the period beginning on the date of purchase and ending upon the date of the last distribution in liquidation attributable to the stock" of Federal held by petitioner by the amount of $998,325.96, which Federal was required to restore to income upon its liquidation less the $519,129.50 of income tax liabilities resulting to Federal from the required restoration.

As has been set forth herein in discussing the computations made by petitioner and respondent, both parties agree that the $519,129.50 of Federal's income tax liability which was assumed and paid by petitioner should be used to increase the adjusted basis of petitioner in Federal's stock for the purposes of section 334(b)(2) because of the provisions of respondent's regulations that such adjusted basis of the subsidiary's stock shall be increased "by the amount of any unsecured liabilities assumed by the parent." The argument between the parties is whether the increase in Federal's income because of including its bad debt reserve of $998,325.96 in its income for its final taxable period ending October 10, 1958, resulted in an increase in Federal's earnings and profits for that period to the extent that the increase in its income exceeded the Federal income tax applicable thereto, and if so, whether these earnings and profits were "of the period beginning on the date of purchase and ending on the date of the last distribution in liquidation attributable to the stock" of Federal held by petitioner.

Respondent never faces the problem head-on, but rather argues that something in the nature of a double benefit will be received by petitioner if petitioner's position is adopted. Respondent calls attention to the provision requiring a subsidiary that is on the cash receipts and disbursements method of accounting to compute its earnings and profits for the purpose of adjustments required by respondent's regulations issued pursuant to section 334(b)(2) as if it had used an accrual method of accounting prior to the time its stock was acquired by its parent. Respondent does not contend that the income of Federal would not have been properly increased by adding into income its reserve for bad debts regardless of Federal's method of accounting.

In our opinion the evidence shows that Federal's earnings and profits for its final period from January 1 through October 10, 1958, were increased by $479,196.46 because of the addition to its income for that period of its bad debt reserve. Both parties recognize that under our decision in *West Seattle National Bank of Seattle*, 33 T.C. 341 (1959), affd. 288 F. 2d 47 (C.A. 9, 1961), upon a sale of corporate assets pursuant to a plan of complete liquidation with accounts receivable being sold at face value, the reserve for bad debts of an incorporated national banking association conducting a general banking business constitutes ordinary income to that banking corporation and is taxable as such for its final period. Both parties also recognize that under our holding in *Argus, Inc.*, *supra*, when a subsidiary corporation is merged into its parent in a transaction to which section 334(b)(2) is applicable, the balance in the reserve for bad debts of the subsidiary constitutes income to the subsidiary for its final taxable period. In fact neither party contends that the inclusion in Federal's income of its bad debt reserve for its final taxable period was improper or that the amount of Federal's bad debt reserve was not income to Federal for that period.

Respondent makes some argument comparing the inclusion of the bad debt reserve in Federal's income to the realization of gain by Federal. However, in *West Seattle National Bank of Seattle*, *supra*, we specifically held that the bad debt reserve was added into income and constituted income and not gain on the disposition of an asset. In that case the taxpayer argued that the method of handling the transaction was the same as a sale of its accounts receivable at a profit and that the formality of the transaction would be given more weight than its substance if the bad debt reserve were considered to be an addition to income rather than a gain on the sale of an asset. The Ninth Circuit, in affirming our holding in that case, stated in the concluding paragraph of its opinion:

We do not regard this accomplishment as purely formal and without substantial effect. The price paid by a purchaser for accounts receivable will affect the

extent to which he himself can write off bad debts or take deductions for a bad debt reserve upon the accounts purchased. The ability of a liquidating corporation to transfer accounts receivable at face value with no tax consequences to itself would seem to result in its ability to confer a tax advantage upon its transferee: an advantage analogous to a stepped-up basis for an asset sold.

In our view the record here fully supports the fact that Federal's earnings and profits for its final period ending October 10, 1958, were increased by $479,196.46 because of its being required to include in its income for that period its bad debt reserve. It is questionable whether the possibility that petitioner might in substance be receiving the benefit of a "double deduction" in a situation such as that here present is a factor to be considered in reaching our conclusion on the issue here presented. See *United States Holding Co., supra.* However, we do not agree with respondent that petitioner is receiving a "double deduction." Petitioner was entitled in 1958 to increase its bad debt reserve because of an increase in its accounts receivable entitling it to such an increase under its method of computing its bad debt reserve which method was approved by respondent. This reserve may be used by petitioner by charging against it any uncollectible debts. Respondent does not contend that petitioner's reserve for bad debts as increased because of its acquiring Federal's accounts receivable, is not a reasonable reserve for anticipated bad debts which may arise in petitioner's operations. The fact that the accounts receivable which caused petitioner to be entitled to increase the reserve came from Federal does not change the nature of the reserve. Therefore, we see no "double deduction" or double benefit which petitioner received because of its increase in the year 1958 in its bad debt reserve.

The two pertinent problems are (1) whether respondent's regulation providing for the increase of the adjusted basis of Federal's stock held by petitioner by the portion of Federal's earnings and profits for the period beginning on the date of purchase and ending upon the date of the last distribution in liquidation attributable to Federal's stock held by petitioner is a reasonable interpretation of the statute which provides for certain specified adjustment "and for other items," and (2) if this regulation is a reasonable interpretation of that statute, was the portion of Federal's earnings and profits "of the period beginning on the date of purchase and ending on the date of the last distribution in liquidation" the amount of $479,196.46. Petitioner is accepting respondent's regulation as reasonable and respondent makes no argument to the contrary. Therefore, for the purpose of this case, we will accept respondent's regulation as a reasonable interpretation of the statute.

There was an increase in earnings and profits of Federal for its period ending October 10, 1958, because of the additional income it

received by adding its bad debt reserve to income. October 10, 1958, was the "date of the last distribution in liquidation" attributable to Federal's stock held by petitioner since the complete liquidation was accomplished on that date. October 10, 1958, was also "the date of purchase" of Federal's stock by petitioner. Because of the approval of the Comptroller of the Currency of the U.S. Treasury Department being required to effect the merger, the purchase by petitioner of Federal's stock and the merger of Federal into petitioner occurred on the same day. However, the stipulated facts clearly state that the merger followed the acquisition of Federal's stock by petitioner.

Respondent does not argue that because the date of purchase and the date of the last distribution were the same, the earnings and profits cannot be "of the period beginning on the date of purchase and ending upon the date of the last distribution in liquidation." As petitioner points out, it is clear that it was the distribution in liquidation that required the addition to income of the reserve for bad debts since it was upon the liquidation that the bad debt reserve was no longer needed by Federal. See *Geyer, Cornell & Newell, Inc.*, 6 T.C. 96 (1946). Therefore, it was an event happening on October 10, 1958, immediately subsequent to petitioner's acquisition of Federal's stock that caused the necessity of adding the $998,325.96 bad debt reserve to petitioner's income for its period January 1 through October 10, 1958. If respondent's regulation read the period beginning "at the time" of the purchase of the stock and ending "at the time" of the last distribution in liquidation, instead of the period "beginning on the date of" the purchase and "ending upon the date of" the last distribution, the situation here would fit squarely within those regulations. However, respondent makes no argument that because "the date" of purchase of the stock and "the date" of the last distribution in liquidation was the same day, October 10, 1958, the regulation is not applicable. The cause of the increase in income, and therefore the increase in earnings and profits, of Federal was the distribution of all of Federal's assets in liquidation under an arrangement to which section 334(b)(2) was applicable. This is the situation which respondent's regulations cover. We, therefore, conclude that petitioner was correct in adding the earnings and profits resulting to Federal from the inclusion of the bad debt reserve in its income to the adjusted basis of Federal's stock in accordance with respondent's regulations for the purpose of determining its total basis in the assets which it acquired from Federal in accordance with the provisions of section 334(b)(2).

*Decision will be entered for petitioner.*