ESTATE OF JOSEPH E. SALSBURY, DECEASED, IOWA-DES MOINES NATIONAL BANK AND JOHN G. SALSBURY, CO-EXECUTORS, ET AL [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Estate of Salsbury v. Commissioner
Docket Nos. 3094-72, 3095-72, 3096-72, 3097-72.
United States Tax Court
T.C. Memo 1975-333; 1975 Tax Ct. Memo LEXIS 36; 34 T.C.M. (CCH) 1441; T.C.M. (RIA) 750333; November 10, 1975, Filed James F. Swift, Jr. and John V. Donnelly, for the petitioners. Ronald M. Frykberg, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in Federal estate tax due from the Estate of Joseph E. Salsbury, deceased, in the amount of $ 6,007,503.13 and deficiencies in Federal gift taxes as follows: Petitioner
Docket No.
Year
Deficiency
John G. Salsbury
3095-72
1967
$ 3,730.50
1968
14,759.89
1969
13,783.44
Doris J. Salsbury
3096-72
1967
3,087.57
1968
11,975.49
1969
12,174.17
Frances I. Zbornik
3097-72
1967
5,595.75
1968
25,551.28
1969
55,488.76
1970
62,472.58
*38 The cases were consolidated for trial, briefs and opinion. The issues presented for decision are as follows: (1) the valuation of 372,152 shares of class A common stock of Salsbury Laboratories, representing 51.8 percent voting power, as of December 1, 1967; (2) the valuation of shares of class B common stock of Salsbury Laboratories which were the subject of gifts on December 15, 1967, December 31, 1968, December 30, 1969, [2] and December 31, 1970; (3) whether retirement benefits of $ 61,696.78 are includable in decedent's gross estate; and (4) whether $ 3,110 found in a safe-deposit box is includable in decedent's gross estate. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts and exhibits are incorporated by this reference. At the time of filing the petition *39 in docket No. 3094-72, the Iowa-Des Moines National Bank and John G. Salsbury were co-executors of the Estate of Joseph E. Salsbury, deceased. Joseph E. Salsbury (hereafter sometimes referred to as the decedent) died testate on December 1, 1967, a resident of Charles City, Iowa. The Federal estate tax return for the Estate of Joseph E. Salsbury, deceased, was filed with the District Director of Internal Revenue, Des Moines, Iowa. Pency P. Salsbury was the wife of the decedent. John G. Salsbury and Frances I. Zbornik are the son and daughter of the decedent and Pency P. Salsbury. At the time his petition was filed in docket No. 3095-72, John G. Salsbury resided in Clear Lake, Iowa. He was married to Doris J. Salsbury. John G. Salsbury filed gift tax returns for the taxable years 1967 and 1968 with the District Director of Internal Revenue, Des Moines, Iowa. He filed a gift tax return for calendar year 1969 with the Internal Revenue Service Center, Kansas City, Missouri. On the date her petition was filed in docket No. 3096-72, Doris J. Salsbury resided in Clear Lake, Iowa. Doris J. Salsbury filed gift tax returns for the taxable years 1967 and 1968 with the District Director *40 of Internal Revenue, Des Moines, Iowa. She filed a gift tax return for the taxable year 1969 with the Internal Revenue Service Center, Kansas City, Missouri. On the date her petition was filed in docket No. 3097-72, Frances I. Zbornik resided in Charles City, Iowa. Frances I. Zbornik filed gift tax returns for the taxable years 1967 and 1968 with the District Director of Internal Revenue, Des Moines, Iowa. She filed gift tax returns for the taxable years 1969 and 1970 with the Internal Revenue Service Center, Kansas City, Missouri. Stock Valuation
Salsbury Laboratories was incorporated on December 31, 1927, under the name of Dr. Salsbury's Poultry Service Co. At all times relevant, Salsbury Laboratories has been and continues to be an Iowa corporation. Since its inception, Salsbury Laboratories has been engaged in manufacturing drug and health products for the poultry industry. The company was founded by decedent, a veterinarian who began developing products for poultry diseases. The company's principal operations are located at Charles City, Iowa. The company has manufacturing facilities in Kitchener, Ontario, Canada, through a wholly owned subsidiary, Salsbury Laboratories *41 Limited, formed in 1962. The Canadian subsidiary manufactures poultry feed additives and pharmaceutics for distribution in Canada. In 1964, Salsbury Laboratories acquired From Laboratories, Inc., Grafton, Wisconsin. From Laboratories manufactures small animal biologics which are sold through distributors to veterinarians. In 1966, Salsbury Laboratories formed a wholly owned subsidiary, Salsbury, S.A. de C.V., with operations in Mexico City, Mexico. This subsidiary manufactures pharmaceutics, feed additives and biologics. During 1968, Salsbury Chemicals Limited, a wholly owned subsidiary with principal offices in London, England, was organized by Salsbury Laboratories. A 49 percent owned corporate subsidiary, Salsbury Japan Co., Ltd., was incorporated in 1970 with principal offices in Tokyo, Japan. In addition to the above subsidiary operations, Salsbury Laboratories, during the period from December 1967 through 1970, had branch offices or distribution points at New Castle, Delaware; Decatur, Georgia; Little Rock, Arkansas; and San Jose, California. Salsbury Laboratories' products are sold in many parts of the world. Excluding antibiotics, Salsbury Laboratories produces one of the *42 most complete lines of through-the-feed medications in the animal health industry. In 1967, Salsbury Laboratories had one of the world's largest facilities devoted to poultry health. The company has had a history of plant and building expansion. During 1967, Salsbury Laboratories owned approximately 400 acres of land in the Charles City, Iowa area, about one-fourth of which was used in its operations. The balance was held for possible future expansion. In 1969, a new $ 4.75 million research and administration building was completed. Agreements for two loans of $ 1,250,000 each were approved by the board of directors of Salsbury Laboratories on July 10, 1967, to finance the construction of the new research and administration building. During 1967, Salsbury Laboratories and its subsidiaries had about 500 employees. Approximately 350 employees were connected with the Charles City operations. The size of the company's domestic sales force was substantially smaller than that which existed prior to its decline in sales and loss of accounts which occurred after 1960. During 1967 and 1968, the research department of Salsbury Laboratories employed approximately 100 persons. The number of *43 persons involved in research began to decline in 1969 due to increased government regulations and the failure of the research department to develop new and improved products. During the period 1967 through 1970, Salsbury Laboratories' principal competitors were major drug companies which had animal health divisions. Salsbury Laboratories' competitors included Abbott Laboratories, Pfizer, Cutter Laboratories, Diamond Laboratories, Merck, Norwich Pharmacal, Upjohn Co. and Eli Lilly & Co. In late 1960 or early 1961, it was discovered that the Salsbury coccidiostats caused a hemorrhagic syndrome in poultry which previously had been fed a coccidiostat manufactured by their competitors. Such disease normally would cause the birds to die. Thus, it was necessary that a bird be fed Salsbury's product immediately following birth and before it was fed any competitors' coccidiostat. Otherwise, the bird might contract the disease and die. This problem did not arise from the use of competitors' products. Salsbury has never been able to resolve this problem. In 1961, Merck & Co. and Dow Chemical increased promotion of several new coccidiostats, introduced earlier, which intensified competition *44 in the coccidiostat field. Salsbury's sales of these products fell from just over $ 11,000,000 in 1960 to $ 5,000,000 in 1961, and they have continued to decline since that time as Merck and others introduced newer products. Salsbury has been unable to develop any new products. Other products in the feed additive group cannot fill the void in sales volume created by the decline in sales of coccidiostats because markets are limited for these products, competition is extremely heavy, and Salsbury must rely on outside sources of supply for some of these products. This drop in sales of coccidiostats has had a depressing effect on the company's actual and potential earnings not only because sales of coccidiostats constituted a large portion of Salsbury's total sales but also because the profit margins on such sales were relatively high. A schedule of sales of the primary categories of products of Salsbury Laboratories for the years 1958 through 1970 follows: SALSBURY LABORATORIES - SALES - PARENT ONLY 1958 - 1970
1958
1959
1960
1961
1962
Coccidinstats
3,515,913
10,992,954
11,034,709
5,117,299
4,251,391
Growth Promotants
2,343,384
1,636,343
1,434,017
1,339,977
1,293,209
Antibiotics
50,903
640,518
561,969
529,319
Histomonastats
1,053,097
921,671
1,063,217
1,466,604
1,173,941
All Others
454,850
436,205
697,758
680,508
550,538
Total Feed Additives
7,367,244
14,038,076
14,870,219
9,166,357
7,798,398
Pharmaccutics
2,711,370
2,383,447
2,065,065
2,196, 334
1,659,231
Biologics
1,378,020
1,315,283
1,243,395
1,334,685
1,486,382
Chemicals to Other
Manufacturers(a)
Chemicals to Other
Manufacturers(b)
Chemicals to Other
Manufacturers(c)
Sales to Subsidiaries
88,867
Elimination of
Intercompany Profits
Miscellaneous
Company Total
11,456,634
17,736,806
18,178,679
12,697,376
11,032,878
*45 1963
1964
1965
1966
Coccidinstats
5,636,990
5,841,807
6,243,777
5,385,028
Growth Promotants
1,290,363
1,199,086
1,261,747
1,569,779
Antibiotics
440,468
285,185
349,549
42 3,405
Histomonastats
1,053,918
901,450
951,398
1,263,338
All Others
497,945
489,613
843,590 *
465,376
Total Feed Additives
8,919,684
8,717,141
9,650,061
9,106,926
Pharmaccutics
1,590,473
1,481,457
1,103,783
1,229,736
Biologics
1,606,455
1,780,006
1,839,366
1,876,872
Chemicals to Other
365,336
Manufacturers(a)
Chemicals to Other
973
Manufacturers(b)
Chemicals to Other
151,733
Manufacturers(c)
Sales to Subsidiaries
92,928
128,012
221,755
210,659
Elimination of
Intercompany Profits
Miscellaneous
Company Total
12,209,540
12,106,616
12,814,965
12,942,235
1967
1968
1969
1970
Coccidinstats
4,102,236
3,466,160
2,539,903
2,190,730
Growth Promotants
1, 470,660
1,575,348
1,915,516
1,569,798
Antibiotics
490,583
377,117
465,193
417,573
Histomonastats
1,456,484
929,894
853,558
1,004,512
All Others
454,790
368,814
557,948
780,727
Total Feed Additives
7,974,753
6,717,333
6,332,118
5,963,340
Pharmaccutics
961,041
954,075
1,150,453
1,466,522
Biologics
2,278,675
2,461,689
2,730,484
2,481,953
Chemicals to Other
715,483
694,009
433,075
962,665
Manufacturers(a)
Chemicals to Other
10,529
200,159
965,030
1,638,319
Manufacturers(b)
Chemicals to Other
337,187
227,697
312,232
571,783
Manufacturers(c)
Sales to Subsidiaries
319,906
329,028
642,179
690,587
Elimination of
(19,498)
Intercompany Profits
Miscellaneous
199
30,613
16,397
Company Total
12,597,574
11,564,691
12,596,184
13,791,566
*46 The following tabulation compares Salsbury's sales of feed additives for the years 1965 through 1970 with total U.S. sales as projected by the Animal Health Institute: Feed Additives -
Year
U.S.
Salsbury
Percentage
1965
$ 185,773,000
$ 9,650,000
5.2%
1966
214,894,000
9,107,000
4.2%
1967
220,600,000
7,975,000
3.6%
1968
217,417,000
6,717,000
3.1%
1969
264,501,000
6,332,000
2.4%
1970
316,028,000
5,963,000
1.9%
A schedule of the consolidated net sales and earnings of Salsbury Laboratories and its subsidiaries for the years 1963 through 1970 follows: 1963
1964
1965
1966
Net sales
$ 12,314,526
$ 13,551,210
$ 14,617,120
$ 15,037,234
Cost of sales
5,960,251
6,767,456
6,712,101
7,342,709
Gross profit
6,354,275
6,783,754
7,905,019
7,694,525
Percentage of net sales
51.6%
50.1%
54.1%
51.2%
Other operating expenses
4,677,164
5,271,933
5,808,362
6,322,102
Operating income
1,677,111
1,511,821
2,096,657
1,372,423
Other (income)
deductions, net
(31,161)
13,783
( 3,987)
(26,834)
Earnings (loss) before
income taxes
1,708,272
1,498,038
2,100,644
1,399,257
Income taxes (refund)
892,000
681,327
952,044
721,248
Net earnings (loss)
$ 816,272
$ 816,711
$ 1,148,600
$ 678,009
Percentate of net sales
6.6%
6.0%
7.9%
4.5%
Percentage to equity
capital
7.7%
7.2%
9.3%
5.2%
*47 1967
1968
1969
1970
Net sales
$ 14,901,020
$ 14,120,284
$ 15,211,529
$ 17,033,067
Cost of sales
7,111,928
7,913,846
8,413,356
9,485,925
Gross profit
7,789,092
6,206,438
6,798,173
7,547,142
Percentage of net sales
52.3%
44.0%
44.7%
44.3%
Other operating expenses
6,417,787
6,137,943
6,180,667
6,320,930
Operating income
1,371,305
68,495
617,506
1,226,212
Other (income)
deductions, net
(37,700)
154,210
214,426
171,074
Earnings (loss) before
income taxes
1,409,005
(85,715)
403,080
1,055,138
Income taxes (refund)
589,087
(24,536)
190,387
508,992
Net earnings (loss)
$ 819,918
$ (61,179)
$ 212,693
$ 546,146
Percentate of net sales
5.5%
(.4%)
1.4%
3.2%
Percentage to equity
capital
6.0%
(.5%)
1.6%
3.9%
During 1967, a number of the smaller companies in the animal health industry were being acquired by larger companies seeking to integrate business operations. Salsbury Laboratories was frequently approached before and after the decedent's death by various companies proposing merger possibilities. Merger activity during 1967 for all types of manufacturing industries was at a record level in comparison *48 with all prior years. During the months around December 1967, substantial premiums in the area of 50 percent to 60 percent were being offered and paid by corporations to acquire majority control stock interests in other corporations. On December 1, 1967, the date of decedent's death, and at all times relevant thereafter, the authorized capital stock of Salsbury Laboratories consisted of 60,000 shares of preferred stock with a par value of $ 100 per share, 900,000 shares of class A common stock with a par value of $ 1 per share and 36,000 shares of class B common stock with a par value of $ 25 per share. On December 1, 1967, the issued and outstanding capital stock of Salsbury Laboratories consisted of 690,000 shares of class A common stock and 27,920 shares of class B common stock. The decedent owned 372,152 shares of class A common stock which represented 51.8 percent of the voting power of the outstanding shares of Salsbury Laboratories. The balance of the outstanding shares of Salsbury Laboratories was owned by members of decedent's family, trusts for their benefit, and a private charitable foundation. The stock of Salsbury Laboratories has never been publicly traded. On December 18, 1967, the *49 board of directors of Salsbury Laboratories authorized the issuance of a stock dividend consisting of two shares of $ 100 par value preferred stock of Salsbury Laboratories for each share of class B common stock of Salsbury Laboratories then outstanding. The stock dividend served no corporate or business purpose. The dividend was declared for the benefit of Salsbury family members to effect a reduction in the value of the class B shares for gift tax purposes. The Articles of Incorporation of Salsbury Laboratories in effect on December 1, 1967, and thereafter, provided in pertinent part as follows: ARTICLE III Capital Stock
Section 1. * * * The relative rights, preferences and priorities, to which the holders of shares of the respective classes of stock shall be entitled, or limitations and applicable restrictions thereto, shall be as follows: (a) Preference as to dividends. The holders of the preferred stock shall be entitled to receive, when and as declared by the Board of Directors, dividends at the rate of six percent (6%) per annum, and no more, payable on such dates as shall be fixed by the Bylaws of the corporation or by resolution of the Board of Directors. *50 Dividends on the preferred stock shall be cumulative from and after the date of its issue, and shall be paid, or set apart for payment, before any dividend on any other stock of the corporation shall be paid or set apart, so that, if for any year, dividends at the rate of six percent (6%) per annum shall not have been paid upon or set apart for the preferred stock, the deficiency shall be fully paid or set apart for payment, before any dividends shall be paid upon, or set apart for, any other stock of the corporation. Similarly, the holders of the Class A common stock shall be entitled to receive, when and as declared by the Board of Directors, dividends at the rate of six percent (6%) per annum, and no more, payable on such dates as shall be fixed by the Bylaws of the corporation or by resolution of the Board of Directors. Dividends on the Class A common stock shall also be cumulative from and after the date of issue, and shall be paid, or set apart for payment, after provision has been made for preferred stock dividends, before any dividend on Class B common stock shall be paid or set apart, so that, if for any year, dividends at the rate of six percent (6%) per annum shall not *51 have been paid upon or set apart for the Class A common stock, the deficiency shall be fully paid, or set apart for payment, before any dividends shall be paid upon, or set apart for, the Class B common stock of the corporation. Whenever the full cumulative dividends upon the preferred stock and Class A common stock at the rate of six percent (6%) per annum of the par value thereof shall have been paid, or declared and a sum sufficient for the payment thereof set apart, then dividends upon the Class B common stock may be declared by the Board of Directors out of the remainder of the net profit or surplus of the corporation available for dividends. (b) Voting powers. At all meetings of stockholders, each holder of common stock shall be entitled to one (1) vote for each share of such stock standing in his name on the books of the corporation. * * * * *
(d) Liquidation or dissolution. In the event of any liquidation, dissolution or winding up of the affairs of the corporation, whether voluntary or involuntary, the holders of the preferred stock shall be entitled to be paid in full, both the par amount of their shares and the dividends accumulated and unpaid thereon (whether *52 declared or not), before any amount shall be paid to the holders of any other stock, but shall not be entitled to share further in the assets of the corporation or the proceeds of liquidation. Similarly, in such event, the holders of the Class A common stock, shall be entitled to be paid in full, after the making of such payments to the holders of the preferred stock, both the par amount of their shares and the dividends accumulated and unpaid thereon (whether declared or not), before any amount shall be paid to the holders of the Class B common stock, but shall not be entitled to share further in the assets of the corporation or the proceeds of liquidation. After the making of such payments to the holders of the preferred stock and the Class A common stock, the remaining assets of the corporation shall be distributed among the holders of the Class B common stock alone, in accordance with their respective holdings of Class B common stock. (e) Pre-emptive rights. No holder of shares of the capital stock of any class of the corporation shall have any pre-emptive or preferential right of subscription to any shares of any class of stock of the corporation * * * and all such additional *53 shares of stock or any obligations convertible into stock of the corporation may be issued and disposed of by the Board of Directors to such person or persons and on such terms and for such consideration as the Board of Directors in its absolute discretion, may deem advisable; * * * * *
Section 2. The authorized capital stock of this corporation may be increased by the vote of sixty-six and two-thirds (66 2/3%) percent in interest of all voting stockholders, by the adoption of an amendment to these Articles. ARTICLE IV Commencement and Duration
* * * [The] corporate existence shall henceforth be perpetual, unless sooner dissolved by a vote of the majority of the outstanding shares of the voting capital stock, at an annual or at a special meeting called for that purpose, or by unanimous consent as provided by law. * * * Pursuant to the bylaws of Salsbury Laboratories, a shareholder possessing a majority of the voting stock could elect the entire board of directors. A director could be removed at any time by such owner. A majority shareholder, through his power to elect the entire board of directors, could control the general business and affairs of Salsbury *54 Laboratories. Such owner, through the board, could control the declaration of dividends, subject to the provisions of the Articles of Incorporation. In addition, a majority shareholder, through the board of directors, could elect all the corporate officers of Salsbury Laboratories and determine their salaries. On December 15, 1967, December 31, 1968, and December 30, 1969, John G. Salsbury and Frances I. Zbornik each made gifts of class B common stock of Salsbury Laboratories. With respect to the gifts made on each of the above dates by John G. Salsbury to his spouse, Doris J. Salsbury, one-half of the value of these gifts was allowable as a marital deduction as provided by section 2523 of the Internal Revenue Code. [3] One-half of the value of each of the gifts made by John G. Salsbury to third parties was treated as made by his wife, Doris J. Salsbury, pursuant to section 2513 of the Internal Revenue Code. On December 31, 1970, Frances I. Zornik made additional gifts of class B common stock of Salsbury Laboratories. On the estate tax return of the *55 Estate of Joseph E. Salsbury, deceased, the executors reported the value of the class A common stock of Salsbury Laboratories owned by the decedent at $ 1 per share. In the statutory notice of deficiency, the Commissioner valued the class A common stock owned by the decedent at $ 31.31 per share as of December 1, 1967. On their respective gift tax returns for 1967, 1968 and 1969, John G. Salsbury, Doris J. Salsbury and Frances I. Zbornik valued the class B common shares of Salsbury Laboratories which were the subject of gifts by them as follows: Valuation Date
Value Per Share
12/15/67
$ 449.40
12/31/68
228.45
12/30/69
229.36 On her gift tax return for 1970, Frances I. Zbornik valued the class B common shares of Salsbury Laboratories which were the subject of gifts by her during that year at $ 235.88 per share. The Commissioner, in his statutory notices of deficiency, determined the values of the class B common shares to be as follows: Valuation Date
Value Per Share
12/15/67
$ 781.00
12/31/68
581.00
12/30/69
581.00
12/31/70
581.00
Retirement Benefits
The Salsbury Laboratories Retirement Plan was established by an agreement *56 and declaration of trust dated July 15, 1949. Joseph E. Salsbury was a participant in the noncontributory plan. The plan was qualified under section 401(a) of the Internal Revenue Code at the time of decedent's death. The trustees of the plan were Joseph E. Salsbury, John G. Salsbury and J. A. Haase. On December 31, 1949, decedent executed a beneficiary designation naming his estate as the beneficiary of any death benefits under the plan. On December 20, 1963, decedent revoked the prior designation and named as beneficiaries John G. Salsbury and the Iowa-Des Moines National Bank as trustees of the Dr. Joseph Salsbury Trust. Following decedent's death, the trustees of the Dr. Joseph Salsbury Trust received $ 61,696.78 from the Salsbury Laboratories Retirement Plan. The decedent's will, which was executed August 1, 1967, provided in part as follows: ITEM III I direct that all transfer and succession taxes incident to my death upon or with respect to property passing under this Will, or upon or with respect to property not passing under this Will, but upon which property such taxes are assessed, including all such taxes assessed against proceeds from policies *57 of insurance on my life, be paid out of my residuary estate. Unless my residuary estate is insufficient to pay such taxes in full, no claim shall be made by my Executors for any contribution toward the payment of such taxes against any beneficiary under this Will, other than residuary beneficiaries, or against any person, who, by reason of my death receive property outside this Will, or against any person who receives the proceeds of life insurance contracts. * * * * *
ITEM IX 1. I authorize and empower my Executors to sell or mortgage any part of my estate if in their discretion they deem it advisable for the payment of debts and taxes of the estate provided, however, that capital stock of Salsbury Laboratories should not be sold, other than to the "Dr. Joseph Salsbury Trust" under paragraph 2 of this ITEM IX, unless the aggregate of the other personal property of the estate or the proceeds thereof is insufficient to pay said debts and taxes. 2. The executors are authorized to sell to the "Dr. Joseph Salsbury Trust," which trust was created by indenture of trust dated May 13, 1954, and amendment thereto dated August 28, 1963, property, real or personal, including capital *58 stock in Salsbury Laboratories, on such terms and conditions as to price and terms of payment as the Executors and Trustees of said trust shall agree. 3. The Executors are authorized to borrow funds from the "Dr. Joseph Salsbury Trust," which trust was created by indenture of trust dated May 13, 1954, and amendment thereto dated August 28, 1963, upon such terms and conditions as to interest rates, maturity, and security as the Executors and the Trustees of said trust shall agree. 4. In making distributions in accordance with this Will, the Executors shall have full power to divide and distribute in kind, or, with the exception of the limitations prescribed in paragraph 1 of this ITEM IX in regard to the sale of stock of Salsbury Laboratories, to sell the whole or any part thereof, including real estate, and divide and distribute the proceeds in cash or partly in cash and partly in kind; and for the purpose of division and distribution, the judgment of the Executors as to the values to be placed upon the different kinds of property comprising my estate shall be conclusive and final. By his will, decedent devised and bequeathed his homestead, household goods and personal effects *59 to his wife, Pency P. Salsbury. His will also provided for a gift of $ 100,000 to Sioux Falls College. The residue of his estate was to pass to the Dr. Joseph Salsbury Trust. The principal asset of decedent's estate was the class A stock of Salsbury Laboratories owned by decedent at the time of his death. The estate did not have sufficient cash or liquid funds to pay the $ 100,000 cash gift to Sioux Falls College and satisfy the reported $ 133,692.29 Federal estate tax liability, state death taxes, and expenses of administration. On or about January 30, 1969, the executors of decedent's estate sold 299,736 shares of class A common stock of Salsbury Laboratories to the Dr. Joseph Salsbury Trust for $ 299,736. The trustees of the Dr. Joseph Salsbury Trust were permitted, but not required, to lend funds to and purchase property from decedent's estate. At the time of the January 30, 1969, transfer of $ 299,736, the assets of the Dr. Joseph Salsbury Trust were composed primarily of the $ 61,696.78 received from the Salsbury Laboratories Retirement Plan, approximately $ 261,060 of life insurance proceeds and $ 16,357 in interest. On February 7, 1969, the estate invested $ 113,200.60 *60 in U.S. Treasury bills. On November 18, 1969, the final distribution of cash in the amount of $ 104,226.25 was made from the estate to the trust. On November 21, 1969, the balance of decedent's block of stock, 72,416 shares, was delivered to the Dr. Joseph Salsbury Trust. In his statutory notice of deficiency, the Commissioner determined that the value of decedent's interest in the Salsbury Laboratories Retirement Plan was includable in the decedent's gross estate pursuant to sections 2033 and 2039 of the Internal Revenue Code. Cash in Safe-Deposit Box
On the date of decedent's death, safe-deposit boxes numbered 49 and 151 were being rented at the Citizens National Bank, Charles City, Iowa, in the names of Dr. J. E. Salsbury or Pency P. Salsbury or John G. Salsbury. The property in box number 49 on the date of decedent's death consisted of the following items: the decedent's 372,152 shares of class A stock of Salsbury Laboratories, Pency P. Salsbury's 75,072 shares of class A stock and seventy $ 1,000 municipal bonds owned by Pency P. Salsbury. Box number 151 contained the following items: an abstract of title and warranty deed for real property owned *61 by decedent, decedent's will, $ 3,110 in currency and some miscellaneous items. It was concluded by petitioners that the currency belonged to Pency P. Salsbury. In his statutory notice of deficiency, the Commissioner determined that the $ 3,110 in currency found in box number 151 was includable in decedent's gross estate pursuant to section 2033 of the Internal Revenue Code. ULTIMATE FINDINGS OF FACT 1. The fair market value of the 372,152 shares of class A common stock of Salsbury Laboratories owned by decedent was $ 514,000 on December 1, 1967, the date of his death. 2. The fair market values of the class B shares were $ 449.40, $ 228.45, $ 200 and $ 235.88 per share on December 15, 1967, December 31, 1968, December 30, 1969, and December 31, 1970, respectively. OPINION Issue 1. Estate Tax Valuation
The estate tax valuation issue relates to the fair market value of 372,152 shares of class A common stock [4] of Salsbury Laboratories, representing 51.8 percent of the voting power as of December 1, 1967. *62 Salsbury Laboratories was incorporated under the laws of the State of Iowa on December 31, 1927, and was at all times material herein a corporation having its principal place of business in Charles City, Iowa. Since its inception, Salsbury Laboratories has been engaged in manufacturing drug and health products for the poultry industry. On December 1, 1967, all of the outstanding shares of Salsbury Laboratories were owned by the decedent, members of his family, trusts for their benefit, and a private charitable foundation. The stock of Salsbury Laboratories has never been publicly traded. The term "fair market value" is defined in section 20.2031-1(b), Estate Tax Regs., as follows: The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. * * * A determination of the fair market value of closely held stock, being a question of fact, will depend upon the circumstances in each case. Since valuation is not an exact science, *63 no formula can be devised that will be generally applicable to all cases. The relevant factors to be considered in making valuations of shares of stock in closely held companies are set forth in section 20.2031-2(f)(2), Estate Tax Regs. Both parties offered the testimony of expert witnesses. Each expert, having made numerous valuations of closely held corporations, was well qualified. Petitioners introduced the testimony of one expert witness at trial, John B. Weed. Respondent introduced the testimony of two expert witnesses, Harvey D. Gold and Seigert R. Wendin. The date of death values placed on decedent's shares by the parties and the experts are as follows: Value claimed on estate tax return
$ 372,152
Weed (for petitioner)
558,228
Value determined by Commissioner
in his staturory notice of
deficiency
11,655,000
Gold (for respondent)
8,748,152
Wendin (for respondent)
1,400,000
The three expert witnesses agreed that the value of decedent's stock as a 6 percent cumulative preferred stock, exclusive of the 51.8 percent voting control element, was approximately $ 1 per share. The three experts also agreed that the 51.8 percent voting control element *64 has value, thus rejecting the value placed on the shares in the estate tax return. Furthermore, they all rejected the method used by the Commissioner in valuing the shares. Accordingly, the controversy before the Court concerns how much value, if any, should be assigned to the control element in arriving at the total value of decedent's shares. Before describing and analyzing the theories of the expert witnesses, the powers of a 51.8 percent owner should first be summarized. A 51.8 percent owner could elect the entire board of directors. A director could be removed at any time by such owner. The owner of 51.8 percent voting control, through his power to elect the entire board of directors, could control the business and affairs of Salsbury Laboratories, elect and remove all of the corporate officers, fix their salaries, and control the declaration of dividends, subject to the provisions of the Articles of Incorporation. In addition, a 51.8 percent owner, through the board, could issue the 210,000 shares of unissued class A stock to himself, upon payment of not less than $ 1 per share, and thus could obtain 62.7 percent voting control. Recognizing the limitation on a preferred shareholder *65 to participate in the earnings of the corporation and the inability of such a shareholder possessing voting control to enhance the value of his shares, Mr. Weed, in valuing the decedent's shares, assumed an individual seeking a corporate salary above what he could otherwise command. His analysis consisted of valuing the ability of an individual to obtain a salary in excess of twice what he would otherwise receive. Though the ability to obtain excessive compensation might sometimes be taken into consideration by an individual purchaser in determining the premium he is willing to pay for control, we find Mr. Weed's opinion as to the value of the stock too speculative to be afforded much weight. In his valuation report, Mr. Weed even admitted that the amount of excessive compensation which "any particular individual might try for is a matter of pure speculation." Another flaw in Mr. Weed's valuation of decedent's shares is his failure to consider that the hypothetical willing buyer might be a corporation attempting to obtain additional distribution outlets or sources of supply, especially in light of the record merger activity occurring in 1967. Mr. Gold concluded that the premium for *66 51.8 percent voting control should be determined by first arriving at the value of the class B stock of Salsbury Laboratories which in his opinion had a value of $ 600 per share on December 1, 1967. Based upon a review of a study of premiums paid for control of corporations, other statistical information, and court decisions involving control, Mr. Gold concluded that it would be reasonable to apply a 50 percent premium for control, or one-half of the value of all class B shares outstanding (27,920 at $ 300) for a total of $ 8,376,000. To said premium for control, Mr. Gold added the $ 372,152 preferred stock value, exclusive of control, for a total of $ 8,748,152 which in Mr. Gold's opinion was the value of decedent's 372,152 shares of class A stock of Salsbury Laboratories on December 1, 1967. We find the above valuation approach unconvincing and unrealistic. The payment of a premium for control is based on the principle that the per share value of minority interests is less than the per share value of a controlling interest. Blanchard v. United States,291 F. Supp. 348 (S.D. Iowa 1968). A premium for control is generally expressed as the percentage by which *67 the amount paid for a controlling block of shares exceeds the amount which would have otherwise been paid for the shares if sold as minority interests and is not based on a percentage of the value of the stock held by all or a particular class of minority shareholders. This is supported by the study of premiums paid for controlling interests included in Mr. Gold's valuation report. It was Mr. Wendin's opinion that a 51.8 percent owner, through negotiations or the acquisition of a two-thirds interest, [5] would be able to obtain earnings participation above 6 percent per year upon relinquishing voting control to the Salsbury family. He concluded that one-eighth earnings participation was a reasonable assumption, which, if capitalized at 16 times earnings, would result in a $ 937,600 increase in the value of the class A shares over their par value. The portion of such increase in value inuring to the benefit of the owner of decedent's block of stock would be $ 505,366.40. He further concluded that a 51.8 percent owner's power to control the direction of the assets of Salsbury Laboratories, which includes such owner's ability to elect himself to the highest corporate office and set his *68 own compensation, would be worth $ 122,550. The earnings participation amount of $ 505,366.40 and the direction of asset amount of $ 122,550 were added by Mr. Wendin to the $ 372,152 preferred stock value of the decedent's shares, exclusive of control, to arrive at a total value of $ 1,000,068.40. Based upon his research of the premiums being paid in 1967 for majority stock interests in connection with mergers and acquisitions, Mr. Wendin concluded that a premium of 38.1 percent should be applied to the $ 1,000,068.40 figure, resulting in a fair market value of approximately $ 1,400,000 for decedent's shares. With respect to the earnings participation component of $ 505,366.40, we recognize that this method of analysis might often be used by investors in calculating the worth of a particular investment. However, in Olson v. United States,292 U.S. 246, 257 (1934), the Supreme Court stated: *69 Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value--a thing to be condemned in business transactions as well as in judicial ascertainment of truth. * * * [Citations omitted] In the present case, to partially base the value of decedent's shares on the possibility that the hypothetical purchaser could obtain an uncertain participation in earnings would be to engage in mere speculation and conjecture. We have no objection to Mr. Wendin's opinion as to the value of a majority owner's ability to control the direction of the corporation's assets or the premium percentage used. However, we feel that to apply the two components of value separately results in a duplication of premiums. Applying a 38.1 percent control premium to the $ 372,152 value of decedent's shares, exclusive of the voting control element, we find that decedent's class A shares had a fair market value *70 of $ 514,000 on December 1, 1967. Issue 2. Gift Tax Valuation
The gift tax valuation issue relates to the fair market value of minority shares of class B common stock of Salsbury Laboratories which were the subject of gifts on December 15, 1967, December 31, 1968, December 30, 1969, and December 31, 1970. The shares which were the subject of gifts on the above dates were valued as follows: Values Per Share
Valuation
Tax
Statutory
Date
Return
Notice
Weed
Gold
Wendin
12/15/67
$ 449.40
$ 781
$ 347
$ 600
$ 480
12/31/68 *
228.45
581
210
425
300
12/30/69
229.36
581
200
200
200
12/31/70
235.88
581
189
380
290
The principal point of disagreement between petitioners' expert witness, Mr. Weed, and the respondent's expert witnesses, Mr. Gold and Mr. Wendin, is in the selection of corporations which should be viewed as reasonably comparable to Salsbury Laboratories. *71 Mr. Weed's initial analysis resulted in the selection of two possible groups of comparable companies, Group A (drug and chemical companies) and Group B (agricultural-related companies, including Ralston Purina, Allied Mills, and Central Soya). It was Mr. Weed's opinion that the Group A companies possessed investment characteristics substantially superior to Salsbury Laboratories. After comparing the sales, net income, financial position and operating results of the companies in Group B with those of Salsbury Laboratories, he concluded that they were more nearly comparable than those in Group A. Section 25.2512-2(f)(2), Gift Tax Regs., provides that the value of unlisted shares of stock shall be determined by taking into consideration, in addition to all other relevant factors, "the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange." Salsbury Laboratories during the time in question was a drug manufacturing company, making products for the animal health industry. Five of the eight companies selected by Mr. Weed did not *72 even have divisions engaged in the animal and poultry health industry. Since Mr. Weed's selection of comparable companies fails to satisfy the "same or similar line of business" requirement of the regulations, his valuations, which rely heavily on the Group B companies as comparables, can be afforded little weight. Mr. Gold relied primarily on large ethical drug companies as comparables. Each of the corporations selected as comparables was engaged in the manufacture and sale of animal health products. We conclude that his appraisal suffered from the following flaws, which in combination cause it to be totally rejected: (1) the price-earnings ratios used failed to adequately reflect the vast differences between the marketability of the shares, operating results, trends and growth potential of Salsbury Laboratories and the companies chosen as comparables; and (2) he disregarded the stock dividend of December 18, 1967, apparently on the ground that its sole purpose was to effect a reduction in the value of the class B shares for gift tax purposes. Mr. Wendin, in making his valuations, selected and considered other drug companies which were engaged in, or had divisions engaged in, *73 the production of products for the animal health industry. Several of the companies selected as comparables were competitors of Salsbury Laboratories. The comparable companies selected by Mr. Wendin had an average price-earnings ratio of 23 for 1967 and a five-year (1963-1967) average of 29.7. After considering Salsbury Laboratories' earnings record, the stock's lack of marketability, and other relevant factors, Mr. Wendin concluded that it would be reasonable to apply a price-earnings multiple of 16 to the 1967 earnings ($ 27.88 per share) of the class B stock, resulting in a value of $ 446.08 per share as of December 15, 1967. Applying an average five-year price-earnings multiple of 19 to the five-year (1963-1967) average earnings of $ 29.19 per share resulted in a value of $ 554.23 per share. He then concluded that it would be reasonable to estimate an earnings capacity of $ 800,000 which, capitalized at 16 times earnings, produced a value of $ 435.04 per share. On the basis of these figures, Mr. Wendin was of the opinion that the class B shares had a fair market value of $ 480 per share on December 15, 1967. Applying price-earnings multiples of 19, 23 and 18, respectively, to earnings *74 of $ 800,000, $ 600,000 and $ 800,000 projected as of the end of the years 1968, 1969 and 1970 and taking into consideration other relevant factors, he concluded that the class B shares had a fair market value of $ 300, $ 200 and $ 290 per share on December 31, 1968, December 30, 1969, and December 31, 1970, respectively. In valuing the shares transferred in 1967, 1968 and 1970, Mr. Wendin placed too much emphasis on the past earnings and sales of the company. If in valuing the class B shares as of December 15, 1967, Mr. Wendin had eliminated from consideration the computation based on the past earnings of the corporation and relied solely on the values derived from the capitalization of current and projected earnings, his valuation would have been nearly identical to that used by petitioners in their 1967 gift tax returns. We further find that the use of projected earnings of $ 800,000 as of December 31, 1968, and December 31, 1970, was excessive. We do not believe that Mr. Wendin took adequate consideration of the 1968 loss or Salsbury's deteriorating market position in arriving at this optimistic earnings figure. *75 Expert opinion is only a guide to the Court, where it is in accordance with the proven facts of the record and where it bears indicia of reliability. Estate of Williams v. Commissioner,256 F.2d 217 (9th Cir. 1958). While we do not entirely agree with the appraisals offered by petitioners or respondent, such appraisals establish a reasonable range within which the fair market value of the stock must lie. Based on the entire record, we find that the value of the shares as reported on the gift tax returns for the gifts made on December 15, 1967, December 31, 1968, and December 31, 1970, fairly reflect the value of the class B shares on the respective dates. We further find that the shares transferred on December 30, 1969, had a fair market value of $ 200 per share. Issue 3. Retirement Benefits
Joseph E. Salsbury was a participant in the Salsbury Laboratories Retirement Plan, a noncontributory plan qualified under section 401(a) of the Internal Revenue Code. Following the decedent's death, the Dr. Joseph Salsbury Trust received $ 61,696.78 from the plan. The decedent devised and bequeathed his homestead, household goods and personal *76 effects to his wife, Pency P. Salsbury. His will also provided for a gift of $ 100,000 to Sioux Falls College. The residue of his estate was to pass to the Dr. Joseph Salsbury Trust. All debts and taxes were to be paid from the residuary estate. The principal asset of decedent's estate was the class A stock of Salsbury Laboratories owned by him at the time of his death. The estate did not have sufficient cash or liquid funds to pay the $ 100,000 cash gift to Sioux Falls College and satisfy the reported $ 133,692.29 Federal estate tax liability, state death taxes and expenses of administration. The decedent's will provided in pertinent part as follows: ITEM IX 1. I authorize and empower my Executors to sell or mortgage any part of my estate if in their discretion they deem it advisable for the payment of debts and taxes of the estate, provided, however, that capital stock of Salsbury Laboratories should not be sold, other than to the "Dr. Joseph Salsbury Trust" under paragraph 2 of this ITEM IX, unless the aggregate of the other personal property of the estate or the proceeds thereof is insufficient to pay said debts and taxes. [Emphasis added.] 2. The Executors are *77 authorized to sell to the "Dr. Joseph Salsbury Trust," which trust was created by indenture of trust dated May 13, 1954, and amendment thereto dated August 28, 1963, property, real or personal, including capital stock in Salsbury Laboratories, on such terms and conditions as to price and terms of payment as the Executors and Trustees of said trust shall agree. On or about January 30, 1969, the executors of decedent's estate sold 299,736 shares of class A common stock of Salsbury Laboratories to the Dr. Joseph Salsbury Trust for $ 299,736. At the time of the January 30, 1969, sale the assets of the Dr. Joseph Salsbury Trust were composed primarily of the retirement proceeds, approximately $ 261,060 of life insurance proceeds, and $ 16,357 in interest. Section 2039(c) excludes from the gross estate of a decedent the value of a payment receivable by any beneficiary, other than the executor, of an employees' trust or pension plan meeting the requirements of section 401(a). It is respondent's position that the proceeds do not qualify for the exclusion provided by section 2039(c) because the *78 proceeds were receivable by or for the benefit of decedent's estate. Section 20.2039-2(b) provides that the exclusion set forth in section 2039(c) does not apply to a payment "receivable by or for the benefit of the decedent's estate." Section 20.2039-2(b), Estate Tax Regs., refers to section 20.2042-1(b), Estate Tax Regs., for the meaning of the phrase "receivable by or for the benefit of the decedent's estate." Section 20.2042-1(b), Estate Tax Regs. , provides in partinent part as follows: (1) Section 2042 requires the inclusion in the gross estate of the proceeds of insurance on the decedent's life receivable by the executor or administrator, or payable to the decedent's estate. It makes no difference whether or not the estate is specifically named as the beneficiary under the terms of the policy. Thus, if under the terms of an insurance policy the proceeds are receivable by another beneficiary but are subject to an obligation, legally binding upon the other beneficiary, to pay taxes, debts, or other charges enforceable against the estate, then the amount of such proceeds required *79 for the payment in full (to the extent of the beneficiary's obligation) of such taxes, debts, or other charges is includible in the gross estate. * * * [Emphasis added.] Respondent contends that it was obvious at the time decedent's will was drawn that there were not sufficient funds in decedent's estate to satisfy the obligations of the estate. Respondent further contends that it was anticipated that all or part of the retirement plan proceeds, although payable to the trust, would be available to and used by the executors in order to avoid selling any part of decedent's controlling block of class A stock. An "obligation legally binding upon the other beneficiary, to pay taxes, debts, or other charges enforceable against the estate" is required under the regulations for the inclusion in a decedent's gross estate of proceeds payable to a beneficiary other than the executor under a "qualified" retirement plan. The decedent's will authorized the sale of all or part of the decedent's shares without restriction if the other personal property of the estate were insufficient to pay debts *80 and taxes of the estate. The trustees of the Dr. Salsbury Trust were permitted, but not required, to lend funds to and purchase property from the decedent's estate. In no instrument were the trustees under a legally binding obligation to pay the taxes, debts, or other charges of the estate. In Old Colony Trust Co., Executor,39 B.T.A. 871 (1939), the Court, in a case not unlike the one at hand, stated: The proceeds of an insurance policy are includable in the gross estate so long as there is an obligation, legally binding upon the beneficiary, to use them in payment of taxes or other charges enforceable against the estate. In the case at bar, there is no obligation binding on the beneficiaries, or the trustee representing the beneficiaries, to pay such debts of the estate. On the contrary, the trust agreement authorizes and permits but does not direct or require the trustee "if in its judgment it would be for the best interests of the beneficiaries" to "use and apply the principal and accumulated income of the trust estate to such extent as it may deem necessary for the payment of any debt of the Donor or for taxes." [39 B.T.A. at 876] Therefore, *81 since the retirement plan benefits were not received "by or for the benefit of the estate," the proceeds come within the exclusionary provisions of section 2039(c). Issue 3. Cash in Safe-Deposit Box
On the date of decedent's death, $ 3,110 in currency was found in a safe-deposit box jointly registered in the names of Dr. J. E. Salsbury or Pency P. Salsbury or John G. Salsbury. At that time, it was concluded that this money belonged to Pency P. Salsbury. In his statutory notice of deficiency, the Commissioner determined that the cash was includable in decedent's gross estate under section 2033. Having offered no evidence to support their conclsuion, petitioners have failed to carry the burden of proof placed on them by Rule 142(a), Tax Court Rules of Practice and Procedure, and we find that the cash is includable in decedent's estate. Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: John G. Salsbury, docket No. 3095-72; Doris J. Salsbury, docket No. 3096-72; and Frances I. Zbornik, docket No. 3097-72.↩
2. The Court, at the conclusion of the trial, advised that a fair market value of $ 200 per share would be found for the shares of class B common stock of Salsbury Laboratories which were the subject of gifts on December 30, 1969, because the expert witnesses for both petitioners and respondent testified to that same value.↩
*. Change in classification resulted in $ 220,000 included in this year in feed additives formerly in pharmaceutics. (a) For animal health products. (b) Intermediate chemicals. (c) Foreign.↩
3. All Code references are to the Internal Revenue Code of 1954, as amended.↩
4. The class A common stock of Salsbury Laboratories was essentially voting preferred stock. The holders of such shares were limited to an annual cumulative dividend equal to six percent of its $ 1 par value and were entitled to receive only the par value of the shares plus the accumulated unpaid dividends thereon in the event of liquidation.↩
5. A two-thirds vote was necessary to effect a recapitalization under the Articles of Incorporation. However, any adjustment in the characteristics of the class A and class B shares would have to be fair to the minority shareholders.↩
*. On December 18, 1967, the board of directors of Salsbury Laboratories authorized the issuance of a stock dividend consisting of two shares of $ 100 par value preferred stock of Salsbury Laboratories for each share of class B common stock then outstanding.↩