PHILIP MORRIS INCORPORATED AND CONSOLIDATED
SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket Nos. 28604-82, 33778-83,     Filed April 11, 1991.
38953-84.[1]

*Jerome B. Libin, William S. Corey, Padric K.J. O'Brien, Richard A. Burton,* and *James Randall Buchanan,* for the petitioner.

*Lewis R. Mandel, Diane R. Mirabito,* and *Steven M. Diamond,* for the respondent.

JACOBS, *Judge:* Respondent determined deficiencies in petitioner's Federal income tax as follows:

| TYE | Deficiency |
| --- | --- |
| 12/31/78 | $52,056,108 |
| 12/31/79 | 44,316,979 |
| 12/31/80 | 59,024,150 |

Following concessions, the primary issue for decision is the fair market value of the Seven-Up Co.'s (Seven-Up)

[1]Consolidated for trial, briefing, and opinion.

intangible assets as of June 19, 1978, the date such company was liquidated into the New Seven-Up Co. (New Seven-Up) pursuant to sections 332[2] and 334(b)(2), following the unsolicited acquisition (on June 1, 1978) of all of its stock by New Seven-Up.

We must also decide the propriety of three upward refinements to the adjusted basis of the Seven-Up stock pursuant to section 1.334-1(c)(4)(v), Income Tax Regs. These refinements involve: (1) An increase for Federal income taxes on interim earnings and profits (i.e., earnings and profits of Seven-Up between June 1, 1978, through June 19, 1978); (2) an increase for recapture income items attributable to the period prior to acquisition of Seven-Up's stock by New Seven-Up (i.e., prior to June 1, 1978) which are recognizable on June 19, 1978; and (3) an increase for interim earnings of lower-tier domestic subsidiaries.

Resolution of the value of Seven-Up's intangible assets as of June 19, 1978, and the propriety of the three upward refinements to the adjusted basis of Seven-Up's stock is necessary in order to allocate New Seven-Up's adjusted basis in the Seven-Up stock among the various assets it received upon the liquidation of Seven-Up.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated by this reference.

Philip Morris Inc., a corporation organized and existing under the laws of the Commonwealth of Virginia, had its principal office in New York, New York, when the petitions were filed. Its stock is publicly traded on various stock exchanges.

During the years in issue, Philip Morris Inc. was the common parent of the group of affiliated corporations which constitute the petitioner in this case. Hereinafter, Philip Morris Inc. will be referred to as petitioner and Philip Morris and Consolidated Subsidiaries will be referred to as petitioner and its consolidated subsidiaries.

---

[2]All section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

Petitioner and its consolidated subsidiaries timely filed consolidated Federal income tax returns for 1978, 1979, and 1980. They report their income on a calendar-year basis, employing the accrual method of accounting for both financial and tax purposes.

At all relevant times, New Seven-Up (formerly PMI, Inc.) was a corporation organized under Delaware law with its principal office in St. Louis, Missouri; it also employs the accrual method of accounting to report income. New Seven-Up was a wholly owned subsidiary of petitioner formed for the sole purpose of acquiring Seven-Up. The entity which acquired Seven-Up will be referred to interchangeably as either petitioner or New Seven-Up.

## Background

Prior to the years at issue, petitioner and its subsidiaries were primarily engaged in the manufacture and sale of cigarettes and beer. Petitioner's initial business, the manufacture and sale of cigarettes, was established in 1919.

Between 1958 and 1978, petitioner rose from a near-bottom ranking among the major U.S. cigarette companies to a strong position in the industry. Its cigarette business outside the United States expanded through the export of domestically manufactured goods as well as the acquisition or creation and development of several foreign tobacco companies.

For the period ended December 31, 1977, petitioner's combined operating revenues exceeded $5 billion, with operating revenues and operating income from its tobacco business of approximately $3.5 billion and $615 million, respectively.

Beginning in the 1950s, petitioner and other domestic cigarette manufacturers were confronted with rising public concern regarding the health issues associated with cigarette smoking. In 1964, an advisory committee to the Surgeon General of the U.S. Public Health Service released a report which concluded that cigarette smoking was a health hazard. In 1966, Federal legislation was enacted which required publication of a warning statement on cigarette packaging.

*Petitioner's Diversification History*

Over the years, petitioner implemented a diversification program by acquiring several businesses that were more or less related to its cigarette business. Based on its knowledge of the role packaging plays in consumers' selection of products, petitioner acquired certain specialty paper manufacturers, i.e., in 1957, petitioner acquired Milprint, Inc., the world's largest flexible food packaging manufacturer (which was named Philip Morris Industrial Inc. during the years at issue), in an exchange of stock valued at approximately $16,557,000; and in 1970, petitioner acquired Plainwell Paper Co., Inc., for approximately $3,965,000.

Petitioner believed that the distribution system it had established throughout the United States for its cigarettes could also be utilized for products traditionally sold alongside cigarettes in retail outlets. Thus, in 1960, petitioner acquired the assets of the American Safety Razor Co. in an exchange of stock valued at approximately $22,957,000; in 1963, petitioner acquired Burma Vita Co. (which sold Burma Shave products) for approximately $2 million and Clark Gum Co. for approximately $3,409,000. These latter acquisitions did not prove as successful as desired; accordingly, they were either abandoned (Burma Vita) or sold (American Safety Razor Co. and Clark Gum Co.) prior to 1978.

By the late 1960s, petitioner focused on larger acquisitions that could have a significant impact on its earnings. In this regard, petitioner paid particular attention to the beverage industry.

*The Beverage Industry*

Petitioner periodically investigated various segments of the beverage industry (beer, soft drinks, and juices) with a view toward further acquisitions. The beverage industry, like the cigarette industry, involves the manufacture and sale of consumer products that are agriculturally based, widely distributed, and sold on the basis of consumer preferences for taste, packaging, and advertising.

*The Beer Industry*

In 1968, petitioner undertook a study of the beer industry. At the time, the domestic beer industry generally

consisted of two groups of companies, most of which were family owned or controlled: brewers that had successfully expanded into the national market and had established a premium-priced beer (such as Anheuser-Busch Inc., Jos. Schlitz Brewing Co., and Miller Brewing Co. (Miller)) and regional and local brewers that lacked production capacity and/or the financial resources to compete with the existing national beer companies. Up to this time, the national brewers had increased sales and market share by investing in additional production capacity and new technology in manufacturing and distribution and, with the savings derived from such investments, by increasing marketing and promotional efforts.

During May and June 1969, petitioner unsuccessfully attempted to enter the beverage industry through the acquisition of a major interest in Canadian Breweries Ltd., then the largest Canadian beer manufacturer and owner of the seventh-largest U.S. beer company, Carling Brewing Co. At the end of May 1969, upon learning that petitioner's attempt to acquire Canadian Breweries Ltd. would be unsuccessful, W.R. Grace & Co. (Grace) offered petitioner the opportunity to purchase its 53-percent interest in Miller, then the eighth-largest domestic beer company.

On June 12, 1969, a special meeting of petitioner's board of directors approved the proposed Miller acquisition, based on the recommendation of George Weissman (Weissman) (vice chairman of petitioner's board of directors from 1973 until November 1978 when he became chairman of the board and chief executive officer). Petitioner purchased Grace's interest in Miller, paying approximately $130 million in cash. In 1970, petitioner purchased the remaining 47 percent of Miller from the DeRance Foundation for approximately $97 million.

In 1969, Miller's market share was less than 5 percent. In petitioner's view, Miller was well positioned to capture a larger share of the national premium beer market through its principal brand, Miller High Life, and its established distribution system of approximately 750 independent beer wholesalers in all 50 States. The beer industry was moving away from on-premises consumption of draught beer to take-home consumption of packaged beer. This meant that

advertising was likely to play an increasingly greater role in establishing brand awareness and consumer preference for particular products, and the higher margins obtained on the sale of premium-priced beer generally provided increased funding for advertising and promotion of the product. At the time of the acquisition, Miller High Life was one of only three premium-priced beers distributed on a national basis.

During the 8-year period following the Miller acquisition, petitioner used its financial resources to expand and modernize Miller's manufacturing facilities, used its advertising and promotional know-how to reinforce and broaden nationally Miller's marketing program, and encouraged the introduction of several new products, such as Miller Lite and domestically brewed Lowenbrau, to expand Miller's share of the premium beer market. As a result of its innovative marketing and advertising efforts, petitioner improved Miller's ranking in the domestic beer industry from eighth-place ranking in 1969 to second-place by 1977. For the period ended December 31, 1977, petitioner's operating revenues and operating income from the manufacture and sale of beer were approximately $1.4 billion and $106 million, respectively.

From 1970 through 1976, petitioner did not undertake any further significant diversification.

*The Acquisition of Seven-Up Co.*

By 1977, petitioner (together with all other domestic tobacco manufacturers) was confronted with the introduction of numerous antitobacco and antismoking legislative proposals, as well as the promulgation or proposed issuance of regulations banning or severely restricting the ability to advertise, promote, and distribute cigarettes. Petitioner's senior management recognized that these actions could well have a negative impact on petitioner's cigarette business. Petitioner felt the need to enhance the declining value of its stock, and thus began to consider the possibility of another nontobacco acquisition that would contribute to balanced corporate growth into the 1980s.

Petitioner's senior management evaluated possible areas for diversification at three internal levels: the corporate planning department (the CPD), senior management, and the

diversification committee of the board of directors (the diversification committee).

The CPD was headed by Jetson E. Lincoln (Lincoln), petitioner's vice president of corporate planning from 1972 through the years in issue. The CPD evaluated and reported on all diversification proposals. It also identified possible industries and/or companies for diversification, and assembled information regarding those prospects. If deemed appropriate, the CPD would undertake market research either directly or through independent contractors. In addition, CPD prepared petitioner's 5-year corporate plan.

One of the functions of petitioner's diversification committee was to recommend to the board of directors possible acquisition candidates. Petitioner's board of directors was the only entity with the authority to approve a corporate acquisition.

In early 1977, with the Miller acquisition successfully in place, the CPD undertook a review of the soft drink industry.[3] The CPD's examination of the soft drink industry consisted of researching and evaluating, from publicly

---

[3]There are four key groups of participants in the soft drink industry: extract, syrup or concentrate manufacturers (the manufacturers), bottling companies (the bottlers), raw material and packaging suppliers, and retailers. Of these groups, the manufacturers and the bottlers account for substantially all of the income and profit within the industry.

The bottlers' function is to produce the soft drink from the extract, syrup, or concentrate and distribute the finished product to the consumer directly (by vending) or through retail distribution systems (food stores and other dry goods outlets). Depending upon the nature of the agreement between the manufacturer and bottler, the bottler may also serve as the distributor of syrup to sellers of fountain drinks.

Bottlers were in some instances owned by the manufacturer, but usually were independent companies that had agreed through a franchise contract to manufacture and distribute the finished product within the guidelines established by the manufacturer and to participate with the manufacturer in the advertisement and promotion of the soft drink. In exchange, the franchised bottler was generally granted an exclusive right in perpetuity to bottle and sell the manufacturer's product within a specific geographic area. Generally, a franchised bottler was barred from selling comparably flavored products (e.g., a Coca-Cola bottler could not bottle Pepsi-Cola but could bottle 7-Up), but was not obligated to market and sell the full line of products of a single manufacturer (e.g., a Coca-Cola bottler was not required to bottle Sprite, a lemon-lime product of the Coca-Cola Co.).

By 1977, of the more than 30 manufacturers with regional or national distribution of brand-name soft drinks, five accounted for almost 75 percent of total sales volume. The market share of each of the top five companies for the period 1975-77 (based on cases sold) was as follows:

| Year | Coca-Cola Co. | Pepsi Co., Inc. | Seven-Up | Dr. Pepper Co. | Royal Crown Cola Co. | Total |
|---|---|---|---|---|---|---|
| 1975 | 32.7% | 20.8% | 7.6% | 5.5% | 5.4% | 72.0% |
| 1976 | 33.4 | 21.4 | 7.5 | 5.8 | 5.3 | 73.4 |
| 1977 | 33.9 | 22.3 | 7.2 | 6.3 | 5.0 | 74.7 |

available documents, the economics and structure of the industry as a whole, and three manufacturers in particular: Seven-Up, the Dr. Pepper Co. (Dr. Pepper), and Royal Crown Cola Co. (Royal Crown). The Coca-Cola Co. and PepsiCo, Inc., the dominant companies in the industry, had been eliminated at the outset of CPD's study as being too large for an acquisition by petitioner.

At a diversification committee meeting on March 29, 1977, the CPD presented an interim report on the soft drink industry in general, and on Seven-Up, Dr. Pepper, and Royal Crown, in particular. The report concluded that the industry contained no suitable acquisition candidate for petitioner's diversification. Notwithstanding the CPD's conclusion, the diversification committee recommended that the CPD continue to study the soft drink industry.

By memorandum dated April 21, 1977, Weissman forwarded to Joseph F. Cullman III (Cullman) (chairman of petitioner's board of directors and chief executive officer from 1957 until November 1978) the CPD's reports on the soft drink industry and the three likely acquisition candidates. Despite the report's conclusions, Weissman recommended that petitioner approach Seven-Up.

Additional CPD studies were presented at a special meeting of petitioner's board of directors on April 27, 1977. At the meeting, it was the consensus of the board that petitioner's management should proceed with steps looking toward a possible acquisition.

*The History of Seven-Up Co.*

Seven-Up began in 1920, when C.L. Grigg (Grigg) and E.G. Ridgway (Ridgway) formed the Howdy Co. to manufacture and sell an orange-flavored drink under the trademark "Howdy." Grigg and Ridgway were subsequently joined by F.Y. Gladney (Gladney). In 1929, the company introduced a drink called Bib Label Lithiated Lemon-Lime Soda. In 1930, that drink was renamed "7-Up." In 1936, the name of the Howdy Co. was changed to "the Seven-Up Co."

Prior to 1967, Seven-Up stock was held exclusively by Messrs. Grigg, Ridgway, and Gladney, members of their families, and various family trusts. In 1967, a substantial

portion of Seven-Up's common stock was sold to the public; its stock was traded in the over-the-counter market.

As of the beginning of 1977, a majority of Seven-Up's common stock was owned by or for the benefit of members of the three founding families, officers of Seven-Up, and other persons friendly to Seven-Up management.

In 1977, Seven-Up was engaged principally in the business of manufacturing and selling soft drink extracts and of franchising unrelated bottling companies (and one affiliated bottling company) to manufacture and sell soft drinks under its trademarks (the extract business). Its only major product was the extract used to make the lemon-lime flavored soft drink known as 7-Up. The extract was produced by its subsidiary, the Warner-Jenkinson Co., which was also engaged in the trade or business of manufacturing and selling food colors, flavors, and fragrances (colors business).

The bottler franchise agreements used by Seven-Up in its extract business were typical of those used in the soft drink industry. They conferred upon each franchisee an exclusive franchise in perpetuity to manufacture and distribute a Seven-Up trademarked product in a defined territory.

Over the years, Seven-Up experienced problems with its bottler-distribution system. Seven-Up had no control over its bottler network and lacked economic leverage over the bottlers. Seven-Up's colors business had five major rival companies and hundreds of smaller competitors, each of which competed largely on the basis of price. The industry was regulated by the U.S. Food and Drug Administration. In 1977, there was increasing public concern regarding the health hazards presented by food additives such as Red Dye No. 40.

Consumer awareness of 7-Up was well established in the 1970s. Although, based on market surveys in 1977, 74 percent of those questioned had recently sampled 7-Up, its share of the soft drink market remained in the 7-percent range.

*Petitioner's Consideration of Seven-Up*

On May 19, 1977, at petitioner's request, a meeting between certain officers of petitioner, led by Cullman, and key officials of Seven-Up, was held at Seven-Up headquar-

ters in St. Louis. Petitioner's objective was to determine if Seven-Up was willing to consider a possible merger, and, if so, to obtain permission to conduct a thorough due diligence investigation, including a review of key internal nonpublic documents, such as budgets, monthly management reports, sales analysis reports, etc.

One of petitioner's representatives assured the Seven-Up representatives that petitioner would not consider making an acquisition attempt without their consent, i.e., it would not engage in a hostile takeover. Seven-Up's chairman, Ben H. Wells (Wells), informed petitioner that Seven-Up preferred to remain an independent company and was not interested in being acquired. No information concerning Seven-Up's financial condition was given to petitioner at the meeting, and petitioner was not provided with an opportunity to conduct a due diligence investigation.

Following the May 19, 1977, meeting, petitioner discontinued its pursuit of Seven-Up but continued to investigate other possible acquisition candidates. At the September 27, 1977, diversification committee meeting, Weissman reported that Seven-Up was not available for acquisition.

*Other Beverage Possibilities*

In the beginning of November 1977, petitioner learned from a third party that Tropicana Products, Inc. (Tropicana), a manufacturer of citrus fruit juices, might be available for acquisition. Petitioner's senior management requested the CPD to study the company and the juice industry.

The CPD prepared a report on Tropicana which was presented to the diversification committee on December 20, 1977. Based on the recommendations of petitioner's senior management and the diversification committee, Weissman visited Tropicana's headquarters in early 1978 to open discussions regarding petitioner's possible acquisition of Tropicana. Tropicana's management was not receptive to the possibility of being acquired by petitioner. Shortly after Weissman's visit, petitioner learned that Tropicana was to be acquired by Beatrice Foods Co. for approximately $488 million.

After its rebuff by Tropicana, petitioner requested Alvin E. Friedman (Friedman), then with Lehman Bros. Kuhn Loeb, Inc. (LBKL), and one of petitioner's financial advisers, to assist petitioner in resuming its study of the soft drink industry. In March 1978, LBKL prepared a statistical tabulation of the soft drink industry for petitioner.

In early 1978, Seven-Up reemerged as a possible acquisition candidate. Fred L. Kulmann, executor of the estate of H.C. Grigg (son of one of the original Seven-Up founders), contacted the St. Louis office of LBKL, informing it that he wished to sell approximately 300,000 shares of Seven-Up common stock on behalf of the Grigg estate and requesting LBKL's assistance with respect to the sale. LBKL's St. Louis office alerted its New York office of the Grigg estate stock offering, which resulted in Friedman's learning of the offering; Friedman communicated such information to Cullman and Weissman.

Petitioner sought the Grigg estate block of Seven-Up shares. However, after a series of discussions, petitioner and the Grigg estate were unable to agree on a purchase price, and negotiations were terminated. Nevertheless, the incidents encouraged petitioner to reconsider the feasibility of acquiring Seven-Up.

Beginning in early April 1978, petitioner's officials met on several occasions with representatives of LBKL, and with its attorney, Martin Lipton (Lipton). The purpose of the meetings with LBKL and Lipton was to discuss and plan the strategy regarding a possible acquisition of Seven-Up. LBKL provided oral advice to petitioner concerning similar acquisitions by other companies, including the terms of such acquisitions and the prices paid by the purchasing companies.

Lincoln prepared a memorandum dated April 20, 1978, regarding petitioner's potential acquisition of Seven-Up, which was presented both to the diversification committee at its April 25, 1978, meeting and to a meeting of petitioner's board of directors on April 26, 1978. Lincoln concluded that petitioner could do for Seven-Up what it had successfully done for the Miller Brewing Co., relying largely on expectations regarding the introduction of a new cola product.

By memorandum dated April 20, 1978, Weissman formally recommended to Cullman that petitioner's board of directors authorize management to attempt to acquire Seven-Up. Weissman acknowledged Seven-Up's absence from the cola market as a negative factor, but he believed its acquisition could provide an opportunity for petitioner to enter that segment of the industry.

Petitioner's diversification committee favorably recommended the proposal for consideration by the entire board of directors. Petitioner's board of directors considered the Seven-Up acquisition proposal at its April 26, 1978, meeting. After Lincoln's oral presentation, and extensive discussion, the board authorized management to proceed with the proposed Seven-Up acquisition.

## The Final Steps Leading to the Acquisition

Petitioner considered various approaches to acquire Seven-Up. The approach petitioner and its advisers decided was best suited to accomplish the acquisition and appeal to all Seven-Up stockholders was to offer a new preferred stock, convertible into petitioner's common stock, in exchange for Seven-Up stock, which would constitute a tax-free transaction. As part of the plan, an election to receive cash in lieu of petitioner's convertible preferred stock would be offered for no more than 49 percent of the Seven-Up stock, thereby allowing nonfamily stockholders to receive cash if they so chose. In the event the controlling families rejected the tax-free exchange proposal, petitioner would initiate a cash tender offer for all of the Seven-Up stock, with its obligation to pay for any tendered shares conditioned upon receipt of approximately 51 percent of the outstanding stock.

Petitioner's representatives decided to value the approximately 10.7 million outstanding shares of Seven-Up common stock at $41 per share for purposes of both the tax-free exchange and the cash tender offer. That amount matched the highest price at which Seven-Up stock had traded within the previous 5 years.

On April 24, 1978, the closing bid price quoted for Seven-Up stock was $27.50 per share. (As of April 25, 1978, petitioner had arranged for a credit line of $720 million to

$770 million in order to acquire Seven-Up.) On April 27, 1978, the price of Seven-Up's stock rose from $28.75 per share to a high of $32.50 per share, on a volume of 133,200 shares.

On Friday, April 28, 1978, through arrangements made by LBKL, representatives of petitioner met with George Butterworth (Butterworth), an attorney for several beneficiaries of the H.C. Grigg estate, to discuss the possible acquisition by petitioner of approximately 18 percent of the outstanding Seven-Up shares then held by trusts established for those beneficiaries, at the same price that petitioner would offer to the public. After consulting with his clients, Butterworth rejected petitioner's offer on that same day, indicating that the beneficiaries had no interest in selling their block of Seven-Up shares.

After the close of business on April 28, 1978, Weissman telephoned Wells (Seven-Up's chairman) to request a prompt meeting for the purpose of discussing the acquisition of Seven-Up by petitioner. On Sunday, April 30, 1978, Weissman and other officials of petitioner met with Wells, William E. Winter (president and chief financial officer of Seven-Up from 1977 through its acquisition by petitioner) and other Seven-Up representatives in St. Louis. At the meeting, Weissman described the benefits an acquisition by petitioner would bring to Seven-Up's business, the tax-free acquisition proposal petitioner had designed for Seven-Up's stockholders, and the tender offer petitioner intended to launch the next day (May 1) if an agreement in principle between the two companies was not reached. Wells informed Weissman that he would bring petitioner's offer to the attention of the Seven-Up board of directors on the following Tuesday (May 2) at a regularly scheduled meeting.

Seven-Up issued a press release on May 1, 1978, describing the meeting with petitioner's representatives, the proposed merger, and the threat of a hostile tender offer. Seven-Up declared that it "did not acquiesce in this procedure."

On the same day, May 1, 1978, petitioner made an unsolicited tender offer through its acquisition subsidiary, New Seven-Up (formerly, PMI, Inc.), for all 10.7 million Seven-Up common shares. Petitioner offered $41 per share.

This tender offer was conditioned upon acceptance by holders of approximately 51 percent of the outstanding shares by May 15, 1978.

On May 2, 1978, the Seven-Up board of directors met to consider, inter alia, petitioner's tender offer and merger proposal. The board authorized the First Boston Corp., Seven-Up's financial adviser, to study and render a written opinion on the "adequacy" of petitioner's $41 tender offer. The board also authorized First Boston to assist it in contacting potential alternate bidders.

In a press release issued on May 2, Seven-Up summarized the action it was taking and urged its shareholders not to tender their stock at that time. During the remainder of the week, Seven-Up's senior management consulted with representatives of First Boston, Seven-Up's financial adviser, and its legal advisers, regarding a proper response to petitioner's acquisition proposal.

Seven-Up devised a strategy whereby it would contact companies that its management believed would be better suited than petitioner to operate and manage Seven-Up's business. First Boston was involved in the search for such potential "white knights," which included the Kellogg Co., Anheuser-Busch, Warner-Lambert Corp., the Colgate-Palmolive Co., American Home Products Co., and Dr. Pepper Co. Seven-Up never received a formal offer from any white knight.

Immediately following the announcement of the tender offer and for several days thereafter, the number of Seven-Up shares changing hands increased. The price bid for Seven-Up's stock rose from $37 per share on May 1, 1978, to $43 per share on May 5, 1978.

By resolution adopted on May 6, 1978, Seven-Up's board unanimously recommended to its shareholders that they reject petitioner's tender offer of $41 on the ground that the offer was not in the best interests of Seven-Up and its shareholders. First Boston also advised that the offer was "inadequate." Seven-Up issued a press release to that effect later that day.

In response to information from its investment bankers and legal counsel that Seven-Up was talking to potential white knights, petitioner announced on May 10, 1978, that

it intended to amend its tender offer by raising the bid price from $41 to $46 per share and by eliminating the 51-percent tender condition. Petitioner stated that the amendment would not take effect if prior to the close of business on May 11, 1978, petitioner, Seven-Up, and certain Seven-Up shareholders entered into a tax-free merger agreement. The deadline for tendering shares continued to be May 15, 1978. As a result, Seven-Up shareholders had only 2 business days (Friday and Monday) to tender their shares at the $46 per-share price.

On May 10, 1978, Seven-Up's management requested the Federal District Court in St. Louis to temporarily restrain petitioner from accepting Seven-Up shares under the tender offer. Seven-Up charged that the manner by which petitioner was planning to effect the amendment of its tender offer violated certain requirements of Federal securities laws.

On May 11, 1978, the Federal District Court issued the temporary restraining order requested by Seven-Up. Shortly thereafter, counsel for petitioner and Seven-Up entered into a settlement agreement in which petitioner agreed to fully republish its tender offer, as amended, and to allow shares tendered prior to republication to be withdrawn by the tendering stockholders. Petitioner also agreed to extend the period for tender and withdrawal of shares pursuant to its amended offer by no less than 7 days so that the earliest the offer would expire would be the close of business on May 22, 1978.

On May 15, 1978, petitioner offered $48 cash per share for all of the outstanding shares of Seven-Up stock. On the same day, the Seven-Up board reluctantly accepted the offer, having learned that certain family trusts were considering accepting petitioner's offer without further consultation with the board. An amendment to petitioner's tender offer dated May 16, 1978, reflecting the agreement reached between the two companies added a clause stating that petitioner would not object if Seven-Up canceled presently outstanding stock options upon payment to the holders thereof of the amount by which $45 exceeds the exercise price.

Although Seven-Up's board ultimately recommended petitioner's $48 per-share tender offer to their shareholders, it was a reluctant and disappointed seller. The board would have preferred to keep Seven-Up an independent company.

By May 22, 1978, petitioner (through New Seven-Up) had acquired 78 percent of the outstanding shares of Seven-Up. New Seven-Up extended the period of its tender offer to the close of business on May 31, 1978, by which date it had purchased substantially all of the Seven-Up common stock.

The final aggregate cash purchase price New Seven-Up paid to the former holders of Seven-Up stock was $516,962,448, in order to acquire all 10,724,151 outstanding shares of Seven-Up stock.

Soon after acquiring Seven-Up, members of petitioner's senior management inspected Seven-Up's manufacturing facilities for the first time. They were surprised by the location and poor condition of the manufacturing facilities and by the "low-tech" equipment used by Seven-Up to manufacture its extract (which was described as "stainless steel tubs with big paddles" and as "a couple of bath tubs and a paddle.")

Some time after the acquisition, petitioner disposed of Seven-Up's colors business, and in 1986, disposed of Seven-Up's extract business.

*Subsequent Steps*

On June 16, 1978, New Seven-Up caused Warner-Jenkinson Co., Seven-Up's subsidiary, to merge with and into Seven-Up in a transaction that qualified as a liquidation described in sections 332 and 334(b)(1).

On June 19, 1978, New Seven-Up caused Seven-Up to merge with and into it in a transaction that qualified as a liquidation pursuant to sections 332 and 334(b)(2).

*Valuation Findings*

Petitioner employed the Valuation Research Corp. to appraise the value of the tangible assets (other than inventory) of Warner-Jenkinson and Seven-Up as of June 1, 1978. Petitioner employed Coopers & Lybrand to determine the fair market value of the intangible assets held by Seven-Up and Warner-Jenkinson and of the stock of the

subsidiaries of Seven-Up (other than Warner-Jenkinson), also as of June 1, 1978.

Petitioner and respondent agree that, as of June 19, 1978, the fair market value of the following assets received by New Seven-Up in the complete liquidation of Seven-Up were:

| | |
|---|---:|
| Cash. | $4,558,000 |
| Securities | 16,960,000 |
| Accounts receivables | 5,996,000 |
| Notes and accounts receivables | 23,711,000 |
| Inventories | 36,208,000 |
| Prepaid expenses | 391,000 |
| Land | 4,365,000 |
| Buildings and improvements | 8,985,000 |
| Investment in subsidiaries | 75,501,000 |
| Machinery and equipment. | 5,015,000 |
| Dynapol agreement. | 300,000 |

Still in dispute is the determination of the fair market value, as of June 19, 1978, of the goodwill and other nondepreciable, nonamortizable intangibles of Seven-Up received by New Seven-Up in the liquidation.

### Position of Parties

Petitioner asserts that, although the cash New Seven-Up paid to acquire the Seven-Up stock ($516,962,448) together with capitalizable costs and liabilities assumed (excluding income tax liabilities) aggregated $536,895,629 on June 1, 1978, the fair market value of the assets of Seven-Up received by New Seven-Up in the complete liquidation of Seven-Up on June 19, 1978, aggregated $268,020,000. Petitioner's position is based upon the Coopers & Lybrand appraisal prepared subsequent to the acquisition of Seven-Up and for the purpose of filing petitioner's 1978 income tax return. Respondent asserts that the consideration paid by New Seven-Up for Seven-Up's stock on June 1, 1978, represents the fair market value of the Seven-Up assets received by New Seven-Up.

On its 1978 corporate income tax return, petitioner reported an adjusted basis of $551,087,532 for the Seven-Up stock. In his statutory notice of deficiency dated September 13, 1982, respondent determined New Seven-Up's adjusted basis for the Seven-Up stock to be $539,997,054. The

difference in the parties' determination of adjusted basis for the Seven-Up stock results from the propriety of three upward refinements made to the adjusted basis of the Seven-Up stock pursuant to section 1.334-1(c)(4)(v), Income Tax Regs., involving: (1) Federal income taxes on interim earnings and profits; (2) depreciation recapture and section 1248 income; and (3) interim earnings of lower-tier domestic subsidiaries.

## OPINION

The primary issue for decision is the selection and application of the appropriate method for valuing the intangible assets of Seven-Up. Petitioner contends that New Seven-Up paid a control premium to acquire control of Seven-Up (that is, the fair market value of Seven-Up's assets was less than the amount New Seven-Up paid for the Seven-Up stock) and that the capitalization or excess earnings method should be applied in valuing Seven-Up's intangible assets. Respondent posits that New Seven-Up did not pay a premium to acquire control of Seven-Up, and that Seven-Up's intangible assets should be valued pursuant to the residual method.

It is uncontested that the transaction at issue (the merger of Seven-Up into New Seven-Up) qualified as a liquidation under sections 332 and 334(b)(2) (prior to the complete revision of section 334(b)(2) by section 224(b) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 485.) Former section 334(b)(2) governs New Seven-Up's basis in the property received. That section, before the 1982 amendment, provided that if property is received by a corporation in a distribution in complete liquidation of another corporation, then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. New Seven-Up's basis in the Seven-Up stock equals the purchase price of such stock. Sec. 1012. Pursuant to section 1.334-1(c)(4)(viii), Income Tax Regs., where the subsidiary distributes various assets to the parent, the parent's stock basis is to be allocated among such assets (other than cash and cash equivalents) "in

proportion to the net fair market values of such assets on the date received."

The parties agree as to the value of Seven-Up's tangible assets and one intangible asset (the Dynapol agreement) as of June 19, 1978, the date Seven-Up was liquidated into New Seven-Up. Accordingly, the proper allocation of the basis of the Seven-Up stock to the Seven-Up assets hinges upon the fair market value of the remaining Seven-Up intangible assets.

Initially, we note that there is no single, exclusive method for valuing intangible assets. The valuation of intangible assets acquired as part of a going concern "is a question of fact that cannot be determined on the basis of any simplistic rule or formula" (citation omitted). *Fedders Corp. v. Commissioner,* T.C. Memo. 1979-350, affd. without published opinion 659 F.2d 1066 (3d Cir. 1981), revd. on another issue sub nom. *Borg-Warner Corp. v. Commissioner,* 660 F.2d 324 (7th Cir. 1981). Each case must be considered on its own merits, and a method chosen based upon the particular facts presented. *Concord Control, Inc. v. Commissioner,* 78 T.C. 742, 744 (1982) (citing *Watab Paper Co. v. Commissioner,* 27 B.T.A. 488, 504 (1932)). In *Concord Control, Inc. v. Commissioner, supra,* we described the three most prevalent and useful methods in computing the value of intangible assets: (1) The bargain method, (2) the residual method, and (3) the capitalization method. See *UFE, Inc. v. Commissioner,* 92 T.C. 1314, 1324 (1989). Our determination of which valuation method is properly applicable to the present circumstances will effectively resolve the parties' dispute.

## The Bargain Method

Under the bargain method, the parties' arm's-length bargain is viewed as the appropriate measure of intangible value. *212 Corp. v. Commissioner,* 70 T.C. 788, 800 (1978). To use this method, the parties must have, inter alia, negotiated the value of the intangible assets in an arm's-length context. *Concord Control, Inc. v. Commissioner,* 78 T.C. at 745. The bargain method is unavailable here since the parties did not negotiate a purchase price for the

intangible assets. We note that neither party proposed that we apply the bargain method.

### The Residual Method

Under the residual method, the value of intangibles is determined by subtracting the value of cash, cash equivalents, and tangible assets from the purchase price. See *Banc One Corp. v. Commissioner,* 84 T.C. 476, 502 (1985), affd. in an unpublished opinion 815 F.2d 75 (6th Cir. 1987); *R.M. Smith, Inc. v. Commissioner,* T.C. Memo. 1977-23, affd. 591 F.2d 248 (3d Cir. 1979), supplemented by 69 T.C. 317 (1977); *Jack Daniel Distillery v. United States,* 180 Ct. Cl. 308, 379 F.2d 569 (1967). The use of such method is proper when the values of the tangible assets and business can be ascertained with reasonable certainty. *Northern Natural Gas Co. v. United States,* 470 F.2d 1107, 1110 (8th Cir. 1973); *Solitron Devices, Inc. v. Commissioner,* 80 T.C. 1, 21-22 (1983), affd. without published opinion 744 F.2d 95 (11th Cir. 1984). If the purchase price does not reflect the fair market value of the business and its assets, the residual method should not be used. *Banc One Corp. v. Commissioner, supra* at 502-503.

Respondent contends that the residual method is the correct method for valuing the Seven-Up intangibles since, he argues, the purchase price which New Seven-Up paid for the Seven-Up stock equals the fair market value of Seven-Up as a whole. Utilizing the residual method, respondent asserts that the fair market value of Seven-Up's goodwill and other nondepreciable, nonamortizable intangible assets, as of June 19, 1978, was $357,973,513.

Petitioner posits that the purchase price of the Seven-Up stock exceeded the fair market value of the business at the time Seven-Up's assets were distributed.

### 1. *General Considerations*

The best evidence of fair market value is an arm's-length sale between unrelated parties. *Banc One Corp. v. Commissioner, supra* at 502. When the parties negotiate agreed values of the tangible assets, "this case represents the paradigm for application of the residual method." *Banc One Corp. v. Commissioner, supra* at 502. However, either party

may introduce evidence to rebut the appropriateness of applying the residual method. *R.M. Smith, Inc. v. Commissioner, supra.*

If one component of the residual method equation cannot be established, the method may not be used. *Concord Control v. Commissioner,* 78 T.C. at 746. In *R.M. Smith v. Commissioner, supra,* the Third Circuit Court of Appeals stated:

the theoretical underpinning of the residual value method is that the total price paid for the stock equals the sum of the fair market values of all of the underlying assets. Although this is a sound principle in economic theory, in reality it has its shortcomings. Specifically, it fails to take into account the common situation when one party to the transaction achieves a bargain. If the purchaser of the stock obtains a "good deal," then the residual value method would undervalue the goodwill. If, on the other hand, the price paid is too high, then the computation will result in a correspondingly inflated goodwill figure. This problem does not require rejection of the residual value method—price paid *is* strongly probative, albeit not conclusive, of fair market value. However, it does suggest that the court consider evidence which would require alterations in the figure or abandonment of the formula altogether. [591 F.2d at 252-253; emphasis in original.]

As our discussion below indicates, the "theoretical underpinning of the residual value method" (i.e., the total price paid for the stock equals the sum of the value of the underlying assets) was not present in this case.

*2. Lack of an Arm's-Length Agreement and of Adequate Information*

Petitioner neither negotiated the purchase price of the Seven-Up stock nor agreed on a value for the Seven-Up assets prior to or during the acquisition process. Petitioner's takeover of Seven-Up was hostile, not the result of arm's-length bargaining. Petitioner's proposal for acquiring the Seven-Up stock was presented to the Seven-Up stockholders through the publication of petitioner's tender offer on May 1, 1978. Petitioner's pricing strategy focused on the trading range for Seven-Up stock over the previous 5 years and the expected pressure a substantial premium over market price would place on both the Seven-Up board of directors and certain significant trustee-shareholders to respond favorably to the tender offer. The $41 initial

offering price was equal to the highest price at which Seven-Up stock had traded in the preceding 5 years. Even the final increase in the tender offer from $46 to $48 per share was not negotiated between petitioner and Seven-Up's board of directors.

Petitioner was an overanxious purchaser with a great desire to diversify. It had inadequate information regarding Seven-Up's financial situation and bottler network. At no time prior to the acquisition had petitioner been provided an opportunity to conduct a due diligence investigation of Seven-Up.

In those cases where the Court accepted the price-value equivalence assumption in a stock acquisition transaction, the purchaser's objective was to acquire the target company's assets, and both the purchaser and the seller valued such assets (or relied upon the determinations of others) in negotiating the purchase price of the stock. See *Jack Daniel Distillery v. United States*, 379 F.2d at 579.

Indeed, where courts have applied the residual method, the record contained sufficient facts to permit the court to conclude that: (1) The parties to the transfer were specifically bargaining for the value of the target's business, and (2) the purchaser had sufficient knowledge of such business and its operations, including, for example, preacquisition appraisals of the business or its principal assets, to permit it to engage in reasonably informed negotiations as to the business' value. See *R.M. Smith, Inc. v. Commissioner, supra* (purchaser's principal officer was the accountant for the target corporation, and initial agreement for asset acquisition changed to stock transaction at sole shareholder's request, with adjustment to purchase price for additional assets); *Banc One Corp. v. Commissioner, supra* (acquirer and targets were engaged in same business, acquirer was well aware of targets' business, and acquirer's officers held negotiations over a long period of time with the stockholders of targets and conducted preclosing investigations). Such negotiations did not occur between petitioner and Seven-Up executives. Petitioner's pricing strategy in connection with the tender offer of the Seven-Up stock focused exclusively on its trading range and the expected pressure a substantial premium over market price

would place on the board of Seven-Up and certain fiduciary shareholders.

### 3. *Presence of a Control Premium*

We agree with petitioner that a substantial portion of the price New Seven-Up paid for the Seven-Up stock constituted a "control premium," i.e., a premium that was paid to induce the Seven-Up shareholders to transfer their control of the corporation to New Seven-Up (their combined voting power that gave the shareholders as a group ultimate control over the corporation's affairs).[4]

As a general proposition, Federal tax law has consistently identified control as a separate element to be taken into account for purposes of determining the fair market value of corporate stock, over and above the value that is attributable to the corporation's underlying assets using traditional valuation methodologies. Section 20.2031-2(f), Estate Tax Regs., sets forth guidelines for the estate tax valuation of stock in cases of inadequate or otherwise nonrepresentative market transactions, and requires that consideration be given to "the degree of control of the business represented by the block of stock to be valued." These guidelines are appropriate for income tax purposes as well as estate tax purposes. "There is no distinction, for most purposes, * * * in the meaning of fair market value as used in an estate tax case and one involving income tax." *Champion v. Commissioner,* 303 F.2d 887, 892-893 (5th Cir. 1962), revg. and remanding on another basis T.C. Memo. 1960-51. Accord *Dahlgren v. United States,* 553 F.2d 434, 438 (5th Cir. 1977).

In *Estate of Newhouse v. Commissioner,* 94 T.C. 193, 251-252 (1990), in reference to the valuation of the stock of a closely held corporation for estate tax purposes we stated:

Control means that, because of the interest owned, the shareholder can unilaterally direct corporate action, select management, decide the

---

[4]Petitioner uses a mathematical expression to establish this point: $X \pm Y = Z$, where X represents the value of the underlying assets as determined by reference to Coopers & Lybrand's appraisal and the preoffer market price for the company's stock, Y reflects the "control premium" paid in order to acquire all of the stock, and Z is the aggregate purchase price paid for the stock. Petitioner posits that the Y factor typically is present in an unsolicited acquisition of a publicly traded company, and that the existence of Y in the instant case demonstrates the incorrectness of respondent's application of the residual method.

amount of distribution, rearrange the corporation's capital structure, and decide whether to liquidate, merge, or sell assets. * * * [5]

We believe that this definition equally applies to publicly traded corporations. Voting rights are critical to obtaining corporate control, and voting rights belong to the shareholders, not the corporation. Thus, that portion of the purchase price paid to induce a transfer of shareholder control cannot be considered a payment for a corporate asset.

As we stated in *Estate of Salsbury v. Commissioner,* T.C. Memo. 1975-333:

The payment of a premium for control is based on the principle that the per share value of minority interests is less than the per share value of a controlling interest. [Citation omitted.] A premium for control is generally expressed as the percentage by which the amount paid for a controlling block of shares exceeds the amount which would have otherwise been paid for the shares if sold as minority interests and is not based on a percentage of the value of the stock held by all or a particular class of minority shareholders. * * * [34 T.C.M. 1441, 1451, 44 P-H Memo T.C. par. 75,333 at 1416.]

See also *Estate of Chenoweth v. Commissioner,* 88 T.C. 1577 (1987); *Estate of Feldmar v. Commissioner,* T.C. Memo. 1988-429; *Estate of Oman v. Commissioner,* T.C. Memo. 1987-71.

In the instant case, petitioner established that New Seven-Up paid a premium to acquire control for the Seven-Up stock.

*Expert Testimony*

Michael Bradley, the Everett E. Berg Professor of Business Administration, Professor of Finance, and Professor of Law at the University of Michigan, and Gordon McMahon, a partner at the investment banking firm of Goldman, Sachs & Co., testified on behalf of petitioner. Professor Bradley testified with respect to the law of economics of market transactions for corporate control. Mr. McMahon's testimony related to merger and acquisition activities in the context of hostile takeovers.

Professor Bradley testified that, in contests for the acquisition of control of a publicly traded corporation, the portion of the bid price that is offered to the existing

[5]See also *Estate of Murphy v. Commissioner,* T.C. Memo. 1990-472.

shareholder group to induce them to part with their collective voting power, and thus their control over the corporation and its assets, is a control premium. The amount of a control premium which is offered in such a case is determined by reference to the current market price of the target corporation's stock. This is because, prior to the introduction into the market of information that control of the target corporation may become the subject of a bid, the market price of the stock generally reflects the value of the corporation's underlying assets.

Professor Bradley opined that each share of stock of a publicly traded corporation consists of two essential features: a financial instrument feature and a voting instrument. The "financial instrument" feature reflects the market's evaluation of expected cash-flows in the form of dividends and capital appreciation. That evaluation takes into account the market's assessment of the value of the corporation's underlying assets and the ability of the corporation's management to invest those assets profitably. The voting instrument feature of a share of stock takes on additional value only when a bidder or potential bidder seeks to obtain the stock for its voting power and therefore its control element. It is the voting power inherent in each share that is bid for through the offer of a control premium with the preoffer market price of the stock acting as the base for determining the ultimate offering price. The stock price of such companies will rise with the introduction into the market of the information that control is being sought, and then will fall back to preoffer prices once the market has determined that the company will not be taken over. Prof. Bradley posits that this corroborates the conclusions that the preoffer stock price will provide a representative value of the target corporation's underlying assets and that any premium over market is being offered to acquire something other than the value inherent in the target company's assets. Thus, in the context of an acquisition of a publicly traded corporation, such as Seven-Up, where the preoffer market price of the company's stock is an appropriate indicator of the value of the business, an amount over and above such market price must be paid to its stockhold-

ers as a group in order to acquire from them control of the corporation.

Prof. Bradley further testified that the amount of the control premium is determined largely by reference to stockholder expectations and the bidder's anticipation of those expectations, and hence is likely to be preemptive. Such a bid has the effect of communicating to the solicited shareholders that a better bid is unlikely. The solicited shareholders for their part determine whether such a bid is likely to preempt other bids by reference to control premiums that have been commanded recently in the takeover of other target corporations in the same or similar industries.

We found Prof. Bradley's observations persuasive, and we believe his analysis correctly describes petitioner's acquisition of Seven-Up. During the 2½-month period preceding April 21, 1978, the week before the announcement of the tender offer, the market price for Seven-Up stock rose and fell with the Dow Jones Industrial Average and an unweighted average of stock prices of the other leading extract manufacturers (reflecting the fact that the market was comfortable with its assessment of the value of Seven-Up and that there were no extraordinary events likely to affect the company).

Mr. McMahon testified that approximately 3 to 4 trading days before the May 1, 1978, tender offer, information began filtering into the marketplace concerning the probability of a control acquisition with respect to Seven-Up. The bid price quoted for Seven-Up stock was $27.50 on Monday, April 24, 1978. (Mr. McMahon believes that is the proper base price from which to determine the full amount of the control premium that petitioner paid.) Relying upon his experience, and based on the volume of trading and price movement relative to the two above-noted indices, he determined that the stock began to be affected by takeover rumors on Tuesday, April 25, 1978.

When the tender offer was announced on May 1, 1978, the Seven-Up stock experienced a tremendous surge based on the market's expectations that either petitioner or another buyer would successfully bid away control from the existing stockholders. However, at the beginning of the next week, following the news from the previous weekend

that the Seven-Up board had recommended that its stock-holders reject petitioner's offer, the stock price dropped from the closing bid of $43 per share on the preceding Friday (May 5, 1978), to $40 per share on Tuesday, May 9, 1978, reflecting the market's diminishing expectations that a takeover would in fact occur and that the control premium would actually be paid. The market then reacted positively to petitioner's announcement on May 10, 1978, that it would increase its bid for Seven-Up stock to $46 per share. After the final increase to $48 on the following Monday and the announcement of the Seven-Up board's endorsement, the stock price leveled off at $47.75.

### 4. Conclusion

We conclude that the amount of control premium New Seven-Up paid for the Seven-Up stock was $20.50 per share ($48 paid per share minus the $27.50 price quoted on April 24) or a total of $220,786,045 out of the $516,962,448 total cash paid for the outstanding shares of Seven-Up stock.[6] In our opinion, the purchase price paid for the Seven-Up stock, when reduced by the amount of the premium paid to the Seven-Up stockholders to acquire their right to control the company, approximates the aggregate value of all of Seven-Up's underlying assets (both tangible and intangible), including goodwill. Quantitatively, we find the aggregate value of all of Seven-Up's assets is $296,176,000 (purchase price $516,962,000 minus control premium $220,786,000 equals $296,176,000).

Because the purchase price New Seven-Up paid for the Seven-Up stock did not accurately and fairly reflect the value of the business, it is not appropriate to compute the value of Seven-Up intangible assets under the residual method.

### The Capitalization or Excess Earnings Method

The third method of valuing intangible assets is the capitalization or excess earnings method. This is a formula valuation which requires a calculation of the annual earn-

---

[6]We note that the control premium, which was approximately 75 percent of the market price of Seven-Up stock on Apr. 24, 1978, was well within the range of control premiums being paid at that time to acquire the stock of publicly traded soft drink extract and bottling companies.

ings of the business and compares such earnings with an estimate deemed to be a fair return on the tangible assets alone. The excess earnings, which are deemed to be attributable to the intangible assets of the business, are then capitalized to ascertain the value of intangible assets of the business. See *Forward Communications Corp. v. United States,* 221 Ct. Cl. 582, 608 F.2d 485, 514 (1979); *Concord Control, Inc. v. Commissioner,* 78 T.C. at 747.

Petitioner's valuations expert, Barrie K. Driscoll, of Coopers & Lybrand, relied on Rev. Rul. 68-609, 1968-2 C.B. 327,[7] which fully sanctions the excess earnings approach if there is not a better method available to determine the value of intangible assets. Such caveat is consistent with the case law. *Banc One Corp. v. Commissioner,* 84 T.C. at 502.

Since we have decided that neither the bargain nor residual methods are applicable herein, we agree with petitioner that the excess earnings method (the formula method under Rev. Rul. 68-609, *supra*) should be applied.

Mr. Driscoll investigated and studied the soft drink industry in general, and Seven-Up and other companies within the industry in particular, focusing on the past experience and outlook for the industry as a whole, as well as for Seven-Up and its principal product, 7-Up, to identify the various intangible assets that existed in Seven-Up's businesses.

As part of its review, Coopers & Lybrand examined Seven-Up's detailed consolidated financial statements for 1973 through 1977, conducted on-site inspections of Seven-Up's operations, and interviewed members of Seven-Up management who were involved in all aspects of the extract business, including marketing personnel, the franchising director, and others. Coopers & Lybrand also examined data pertaining to the soft drink industry as a whole and

---

[7]Pursuant to Rev. Rul. 68-609, 1968-2 C.B. 327, the formula approach is stated as follows:

A percentage return on the average annual value of the tangible assets used in a business is determined, using a period of years (preferably not less than 5) immediately prior to the valuation date. The amount of the percentage return on tangible assets, thus determined, is deducted from the average earnings of the business for such period and the remainder, if any, is considered to be the amount of the average annual earnings from the intangible assets of the business for the period. This amount (considered as the average annual earnings from intangibles), capitalized at a percentage of, say, 15 to 20 percent, is the value of the intangible assets of the business determined under the "formula" approach.

Seven-Up's standing therein, focusing on Seven-Up's market share.

Coopers & Lybrand determined that Seven-Up's trademarks and, to a much lesser extent, its secret formulation were the principal intangibles of the extract business which provided value to Seven-Up. Coopers & Lybrand also concluded that there was going concern value, but that there was no separately identifiable value associated with the bottler network other than that reflected in general going concern value. The colors business was also determined to have going concern value. ("Going-concern value is an intangible, nonamortizable capital asset that is often considered to be part of goodwill." *UFE, Inc. v. Commissioner,* 92 T.C. at 1323.)

The term "good will" has been defined as "the sum total of those imponderable qualities which attract the custom of a business,—what brings patronage to the business." *Boe v. Commissioner,* 307 F.2d 339, 343 (9th Cir. 1962), affg. 35 T.C. 720 (1961) (quoting *Grace Bros. v. Commissioner,* 173 F.2d 170, 175-176 (9th Cir. 1949)). It has further been defined as the "expectancy of *both* continuing excess earning capacity and also of competitive advantage or continued patronage" (emphasis added). *Wilmot Fleming Engineering Co. v. Commissioner,* 65 T.C. 847, 861 (1976). The methodology that Coopers & Lybrand applied with respect to valuing goodwill was designed to identify and value such asset in its broadest sense.

The competitive advantage which comprises goodwill is represented by a number of property rights or interests, including tradenames (see, e.g., *R.M. Smith, Inc. v. Commissioner,* 591 F.2d at 252), trademarks (see, e.g., *Renziehausen v. Lucas,* 280 U.S. 387, 388 (1930)), some customer lists (see, e.g., *General Television, Inc. v. United States,* 449 F. Supp. 609, 611-612 (1978), affd. per curiam 598 F.2d 1148 (8th Cir. 1979)), customer routes and other distribution networks, and secret formulae or processes (see, e.g., *Kaltenbach v. United States,* 66 Ct. Cl. 570 (1929)).

Coopers & Lybrand designed an approach for valuing the intangible assets of the extract business which identified the business's excess earnings, i.e., the contribution to earnings which was not attributable to the investment

intangible assets but to the competitive advantage Seven-Up may have enjoyed within the industry. As noted, the method was based upon the principles of Rev. Rul. 68-609, *supra,* and the court decisions that have applied the excess earnings method of valuation.

As an initial matter, Coopers & Lybrand determined from its studies of Seven-Up and the soft drink industry that the precise approach taken in such ruling (determining average earnings for the preceding 5 years) would not provide an accurate starting point for the analysis.[8] Since both Seven-Up and the industry as a whole were showing year-to-year increases in earnings, an average earnings figure based entirely on past performance would have understated the base from which the intangible values would have been calculated under a literal application of Rev. Rul. 68-609, *supra.* Coopers & Lybrand concluded that a discounted value of projected future earnings would provide a more accurate indicator of the company's excess earnings than a capitalization of average past earnings. At trial, Mr. Driscoll noted that a valuation based on the literal language of Rev. Rul. 68-609, *supra,* would have resulted in an "understatement" of the value of the intangible assets.

With respect to its revenue projections, Coopers & Lybrand determined that the revenue earned through the sale of extract was the entire consideration Seven-Up received, not only for the extract itself, but also for the licensing of its trademark, the bottlers' enjoyment of the franchise system, and the marketing, advertising, and promotion, as well as other services Seven-Up provided to the bottlers. The Coopers & Lybrand projections of Seven-Up's volume and price growth for a 20-year period following the acquisition were discussed by Mr. Driscoll with Seven-Up officials, whose views were taken into account when the projections were finalized (annual 4-percent volume growth plus an annual 4-percent price increase), and in the determination of the proper discount or capitalization rate to be used by Coopers & Lybrand. Following a similar examina-

---

[8]The formula described in Rev. Rul. 68-609, *supra,* is not the exclusive means of deriving the value of intangible assets. See, e.g., *Staab v. Commissioner,* 20 T.C. 834, 838 (1953) (two times average annual net profits over 3-year period); and *Barber v. Commissioner,* T.C. Memo. 1963-206 (average net earnings over approximately 10-year period capitalized by a factor of 1.9).

tion of the costs and expenses of the extract business, Coopers & Lybrand computed the projected net earnings of the extract business for the 20-year period 1978-97.

Coopers & Lybrand then determined what it considered to be an appropriate rate of return on the tangible assets used in the extract business. It selected a rate of 10 percent, believing that to be a reasonable appraisal of what an investor would demand as a return on an investment having similar risks and hazards.

As a benchmark in making its determination, Coopers & Lybrand utilized the then-prevailing return commanded on risk-free investments such as U.S. Government obligations. In June 1978, such obligations were yielding 8 percent. Coopers & Lybrand also took into consideration the somewhat higher yields on high-grade corporate bonds. Coopers & Lybrand concluded under the circumstances that 10 percent was the appropriate rate of return an investor would expect to receive on Seven-Up's tangible assets, particularly since the company was in an industry where the contributions to earnings by tangible assets and those by intangible assets were so blurred as to make it difficult to determine an adequate measure of each, and where two extremely competitive corporate giants such as Coca-Cola Co. and PepsiCo overshadowed the smaller companies in the industry. (Pursuant to Rev. Rul. 68-609, 1968-2 C.B. at 328, the 10-percent rate is deemed appropriate if the industry percentage is not available and the risks of the business are not insignificant.)

Coopers & Lybrand next subtracted the fair return on tangible assets determined as described above from total projected net earnings to arrive at Seven-Up's projected excess earnings. It then determined the present value of such excess earnings by applying a 20-percent discount or capitalization rate to the excess earnings for each year within the projected period.[9]

Coopers & Lybrand considered the factors stressed in Rev. Rul. 68-609, *supra* (such as the nature of the business, the risks involved, and the stability or irregularity of the

---

[9]Rev. Rul. 68-609, *supra*, permits the use of a capitalization rate that is double the rate of return associated with the tangible assets.

business's earnings), in determining an appropriate capitalization rate.

Based on the foregoing analysis, Coopers & Lybrand concluded that the aggregate value of all of the individual intangible assets of the extract business at the time of New Seven-Up's acquisition (goodwill in the broad sense) was $80 million. (We note that the $80 million amount Coopers & Lybrand assigned as the value of the intangibles of the extract business under its excess earnings calculation includes the value attributable to the business' going concern value. In our opinion, such inclusion of the going concern value in the excess earnings valuation of intangibles is appropriate. See *Concord Control Inc. v. Commissioner*, 78 T.C. at 743; *UFE, Inc. v. Commissioner*, 92 T.C. at 1326-1327.)

However, since it did not view the authorities as uniform on the point (see *VGS Corp. v. Commissioner*, 68 T.C. 563, 591 (1977); *Fedders Corp. v. Commissioner*, T.C. Memo. 1979-350, affd. without published opinion 659 F.2d 1066 (3d Cir. 1981)), Coopers & Lybrand undertook to determine going concern value separate and apart from goodwill. Going concern value is "the additional element of value which attaches to property by reason of its existence as an integral part of a going concern." *VGS Corp. v. Commissioner*, 68 T.C. at 591. It is manifested by "the ability of the acquired business to generate sales without any interruption because of the take-over." *Winn-Dixie Montgomery, Inc. v. United States*, 444 F.2d 677, 685 n.12 (5th Cir. 1971).

This was done by Coopers & Lybrand through an analysis of the expenses that petitioner avoided by not having to replicate Seven-Up's existing extract business at the time of the acquisition. Coopers & Lybrand placed a present value of $5 million on the savings. Coopers & Lybrand assumed that the company's existing trademark was available for use without having to be developed from scratch.

Coopers & Lybrand properly determined that if going concern value is to be considered separately (notwithstanding use of the excess earnings method to value goodwill), the additional value it provided was attributable to the fact that the existing business was in place and in operation,

rather than merely a collection of assets that petitioner would have to piece together.

Finally, using the same excess earnings approach that it used in valuing the intangibles of the extract business, Coopers & Lybrand determined that Seven-Up's colors business had no excess earnings and thus did not have any valuable goodwill. Such conclusion, which was based on the absence of any excess earnings in the colors business, is consistent with the conclusions we have reached in *UFE, Inc. v. Commissioner*, 92 T.C. at 1326-1327, *Concord Control, Inc. v. Commissioner, supra*, affd. on this point 615 F.2d at 1155-1156, and *VGS, Inc. v. Commissioner*, 68 T.C. at 591. Accord *Emmer v. Commissioner*, T.C. Memo. 1978-102.

Although lacking in excess earnings to support goodwill, the colors business was an established and somewhat profitable concern. Therefore, Coopers & Lybrand concluded that the business had some going concern value. Using the same "avoided cost" approach it used for the extract business (as discussed *supra*), Coopers & Lybrand determined that the colors business had a going concern value of $1,030,000. We believe this amount to be reasonable under all of the facts and circumstances.[10]

In sum, using the value which Coopers & Lybrand determined for Seven-Up's intangible assets, we find that the total value of the company as of June 19, 1978, was as follows:

| | |
|---|---|
| Stipulated assets values | $181,990,000 |
| Nonstipulated intangible assets values | [11]86,030,000 |
| Total value | 268,020,000 |

In comparing this amount with the $296,176,000 amount resulting from the control premium discussion above, it is apparent that both figures result in close approximations (a

---

[10]This Court and others have countenanced recognition of going concern value even though the business lacked either the "excess earnings" or the "competitive advantage" conditions for goodwill. See *Western New York Water Co. v. Commissioner*, 349 F.2d 345 (2d Cir. 1965), affg. a Memorandum Opinion of this Court; *Concord Control, Inc. v. Commissioner*, 78 T.C. 742, 744 (1982); *VGS, Inc. v. Commissioner*, 68 T.C. 563, 591 (1977).

[11]The nonstipulated intangible assets value of $86,030,000 has three components:

$80,000,000—Individual intangible assets value of the extract business.
$5,000,000—Going concern value of extract business.
$1,030,000—Going concern value of colors business.

spread of roughly 10 percent), which validate the reasonableness of the Coopers & Lybrand determination.

We note that respondent did not present any expert witness to rebut the values that Coopers & Lybrand established for the intangible assets.

*Extrinsic Evidence*

It is appropriate to corroborate the result obtained under the applicable valuation method (be it the bargain method, the residual method, or the excess earnings method) by extrinsic evidence. In this regard, we have examined attendant facts and circumstances to determine whether they support petitioner's valuation of Seven-Up's intangible assets. See *Solitron Devices, Inc. v. Commissioner*, 80 T.C. at 17-22; *Banc One Corp. v. Commissioner*, 84 T.C. at 508-509; *Jostens, Inc. v. Commissioner*, T.C. Memo. 1989-656.

The record herein provides sufficient evidence demonstrating that while Seven-Up possessed some valuable intangible assets, the value of such assets was limited by certain specific negative factors. As a result, the aggregate value of the Seven-Up intangibles did not remotely approach the amount suggested by respondent in his application of the residual method.

For instance, lemon-lime drinks such as 7-Up were a distant cousin to colas in terms of consumer choice. Second, the nature of the cola-dominated independent bottling system was such that noncola companies such as Seven-Up generally "piggy-backed" on the national distribution systems of Coke and Pepsi in order to get their soft drinks into the market. Third, the nature of the soft drink industry was intensely competitive, and Seven-Up was unable to enter the cola market.

Thus, petitioner's inability to increase Seven-Up's lemon-lime market share and its failed attempt to market a cola establish that all of the tangible and intangible assets of the extract business were being used in their highest and best capacity as of the date of New Seven-Up's acquisition. Here, such corroborative evidence of negative factors limiting the value of Seven-Up's intangible assets supports the reasonableness of petitioner's valuation. (See *Fedders Corp. v. Commissioner*, T.C. Memo. 1979-350; *R.M. Smith, Inc. v.*

*Commissioner,* T.C. Memo. 1977-23 (estimates may be relied upon where their use and effectiveness is adequately supported by the record)).

In sum, we believe a value of $86,030,000 for Seven-Up's intangible assets as of June 19, 1978 (as determined by petitioner), is reasonable and fair.

## Basis Adjustment Issues

The second issue for decision concerns the propriety of the following increases to the basis of the Seven-Up stock under section 334(b)(2):

(1) Federal income tax liabilities accrued on the earnings and profits of Seven-Up and Warner-Jenkinson for the period June 1, 1978, through June 19, 1978, including the amount related to recapture items attributable to that period;

(2) recapture income items attributable to the period prior to June 1, 1978, which are recognizable on June 19, 1978; and

(3) earnings and profits of domestic subsidiaries of Seven-Up and Warner-Jenkinson for the period June 1, 1978, through June 19, 1978.

We conclude that each of the aforementioned increases was proper.

### 1. *Federal Income Taxes on Interim Earnings and Profits*

Section 1.334-1(c)(4)(v)(*a*)(*1*) and (*2*), Income Tax Regs., mandates an increase in the adjusted basis of the stock of the liquidated corporation for unsecured liabilities of the liquidated corporation assumed by the parent, as well as earnings and profits during the interim period (i.e., between the date the liquidated corporation's stock was purchased and the date of the liquidation).

The Federal income tax liability on the earnings and profits of Seven-Up and Warner-Jenkinson for the period June 1, 1978, through June 19, 1978, accrued on June 19, 1978,[12] when Seven-Up's short taxable year ended by reason

---

[12] The Federal income tax liabity of Seven-Up and Warner-Jenkinson accrued in toto on June 19, 1978,—i.e., the taxes on depreciation recapture and sec. 1248 income attributable to the period prior·to June 1, 1978 (which taxes respondent allowed as an adjustment), as well as

of its liquidation. Said tax liability was assumed by New Seven-Up on that date. And a stock basis increase for tax liability on interim earnings fits squarely within the language of the regulations. See *First National State Bank of New Jersey v. Commissioner,* 51 T.C. 419, 425 (1968).

### 2. *Depreciation Recapture and Section 1248 Income*

In the liquidation, Seven-Up realized and recognized gain on the distribution of certain depreciable assets and the stock of two controlled foreign subsidiaries (limited to the amount of the depreciation recapture and the section 1248 dividends respectively generated by such distributions).[13] Such gains (which accrued on June 19, 1978, the date of the liquidation), in our opinion, constitute interim earnings and profits subject to adjustment in accordance with section 1.334-1(c)(4)(v)(*a*)(2), Income Tax Regs.[14]

In *First National State Bank of New Jersey v. Commissioner,* 51 T.C. 419 (1968), and *R.M. Smith, Inc. v. Commissioner,* 69 T.C. 317 (1977), affd. 591 F.2d 248 (3d Cir. 1979), we held that a distribution of property in liquidation which gives rise to "recapture type" income causes an increase in the liquidating corporation's income and, consequently, an increase in its earnings and profits which occurred subsequent to the last day of the corporation's final taxable period ending with the acquisition. As stated: "This is the situation which respondent's regulations cover." *First National State Bank of New Jersey v. Commissioner, supra* at

---

the taxes on depreciation recapture and sec. 1248 income attributable to the period from June 1 through June 19, 1978, and on other interim earnings and profits (which taxes respondent disallowed as adjustments).

[13]Generally, secs. 1245 and 1250 gain is realized upon the disposition of depreciable property. Such gain must be recognized on a distribution in a complete liquidation of a controlled subsidiary to which sec. 334(b)(2) applies. Likewise, sec. 1248 generally provides that upon the sale or exchange or surrender of stock of certain foreign corporations for redemption in a transaction which would be treated as a sale or exchange under sec. 302 or as a sec. 331 liquidation, the entity surrendering such stock must include in gross income, as a dividend, the portion of such profits of the foreign corporation allocable to the stock surrendered for the period that the stock was held and for the period that the corporation was a controlled corporation in the taxable years beginning after 1962.

Neither the regulations under secs. 1245, 1250, and 1248 nor those under sec. 334 specifically delineate the manner in which recapture gain should be reflected in the basis following a sec. 334(b)(2) liquidation. Therefore, the impact of such gain on the parent's basis in the acquired assets must be determined by reference to the general adjustments under sec. 1.334-1(c)(4)(v), Income Tax Regs.

[14]The amount of the adjustment for recapture items is to be reduced by the amount of the accrued Federal income tax with respect thereto which tax also constitutes a basis adjustment.

428; see also *Tele-Communications, Inc. & Subsidiaries v. Commissioner,* T.C. Memo. 1991-82. Such is the situation in the instant case: Seven-Up distributed in liquidation depreciable property and stock of two controlled foreign corporation subsidiaries[15] which caused an increase (after the acquisition date) in income and earnings and profits on account of depreciation recapture and section 1248 income.

We recognize that neither the *First National State Bank* case nor the *R.M. Smith* case involved section 1248 dividends; however, we believe the analysis therein is equally applicable here. The operative event under section 1248(f)(1) was the distribution by a domestic corporation (Seven-Up) of the stock of two "controlled foreign corporation" subsidiaries in the liquidation. Thus, as in both the *First National State Bank* and *R.M. Smith* cases, the event in the instant case which caused the increases in income and earnings and profits during the interim period occurred subsequent to the last day of Seven-Up's last taxable period ending with the acquisition.

### 3. *Interim Earnings of Lower-Tier Domestic Subsidiaries*

Respondent also takes issue with petitioner's adjustment to the adjusted basis of Seven-Up stock regarding the interim earnings and profits of the lower-tier domestic subsidiaries of Seven-Up and Warner-Jenkinson. Petitioner's position regarding this adjustment, which requires an interpretation of the phrase "the subsidiary's earnings and profits" in section 1.334-1(c)(4)(v)(a)(2), Income Tax Regs., is based on the rules contained in the consolidated return regulations for adjusting the stock basis of members of an affiliated group filing a consolidated return and for adjusting the earnings and profits of such members.

Section 1502 authorizes the Secretary to prescribe such regulations as he deems necessary regarding consolidated returns. Section 1.1502-32, Income Tax Regs., provides that each member of an affiliated group owning stock in a subsidiary shall adjust the basis of such stock in the manner prescribed therein.[16] It also provides that such

---

[15]See sec. 1248(f)(1).

[16]In the case of a chain of members, the adjustments are made from the bottom to the top of the chain. Sec. 1.1502-32(a), Income Tax Regs.

adjustment shall be made generally as of the end of each consolidated return year, but in the case of a disposition of the stock of the subsidiary before the end of the taxable year, the adjustment is made as of the date of disposition.

Section 1.1502-32(e), Income Tax Regs., provides that the amount of the basis adjustment is the difference between the positive adjustment described (as applicable here) in paragraph (b)(1) and the negative adjustment described in paragraph (b)(2). Section 1.1502-32(b)(1)(i), Income Tax Regs., provides that the positive adjustment with respect to a share of a subsidiary which is not limited and preferred as to dividends includes an allocable part of the undistributed earnings and profits of the subsidiary for the taxable year.[17] Here there are no facts which give rise to a negative adjustment; thus, there is a net positive adjustment as described in section 1.1502-32(c)(2), Income Tax Regs., which increases each member's basis in the subsidiary's stock. Finally, section 1.1502-33(c)(4)(ii)(a), Income Tax Regs., provides that, for taxable years beginning after December 31, 1975, the amount of any increase (pursuant to section 1.1502-32(e)(2), Income Tax Regs.) in a member's basis in the stock of its subsidiary shall increase the earnings and profits of such member for such taxable year.

In sum, the consolidated return regulations provide for an increase in a member's stock basis in a subsidiary and in its own earnings and profits to reflect the earnings and profits of the subsidiary. The adjustment is normally made at the end of the taxable year; however, if a subsidiary is treated as disposed of, it is made at the date of disposition. A liquidation under section 334(b)(2) is treated as such a disposition. And, where the subsidiary itself (Seven-Up) owns stock in any other subsidiary (the various lower-tier domestic subsidiaries), the adjustment with respect to the stock of the higher-tier subsidiary is not made until after the adjustment is made with respect to the lower-tier subsidiary.

Thus, under the consolidated return regulations, prior to any adjustments with respect to the stock of Seven-Up or the earnings and profits of its parent, the interim earnings

---

[17]The provisions of sec. 1.1502-32, Income Tax Regs., were involved and strictly construed by this Court in *Woods Investment Co. v. Commissioner,* 85 T.C. 274 (1985).

and profits of Seven-Up's lower-tier domestic subsidiaries "roll up" to Seven-Up and become part of its interim earnings and profits that are the subject of the stock basis adjustment contemplated by section 1.334-1(c)(4)(v)(a)(2), Income Tax Regs.

To reflect the foregoing and concessions of the parties,

*Decisions will be entered under Rule 155.*